# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEO INVESTMENTS HONG KONG LIMITED, a limited liability company organized under the laws of Hong Kong, <br><br> Plaintiff, <br><br> v. <br><br> TOMALES BAY CAPITAL ANDURIL III, L.P., a Delaware limited partnership, TOMALES BAY CAPITAL ANDURIL III GP, LLC, a Delaware limited liability company, and IQBALJIT KAHLON, Managing Member of Tomales Bay Capital Anduril III GP, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2022-0175-JTL |

## POST-TRIAL OPINION

Date Submitted: March 31, 2025
Date Decided: June 30, 2025

A. Thompson Bayliss, Adam K. Schulman, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Andrew W. Stern, Nicholas P. Crowell, Charlotte K. Newell, Peter J. Mardian, SIDLEY AUSTIN LLP, New York, New York; *Attorneys for Plaintiff.*

David E. Ross, Eric D. Selden, Thomas A. Barr, Gage Whirley, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Aaron H. Marks, Amal El Bakhar, Ahson T. Azmat, Elina Chen, Ava I. Roche, KIRKLAND & ELLIS LLP, New York, New York; *Attorneys for Defendants Tomales Bay Capital Anduril III, L.P., Tomales Bay Capital Anduril III GP, LLC, and Iqbaljit Kahlon.*

**LASTER, V.C.**

An investment fund had an opportunity to buy a hot commodity: shares of Space Exploration Technologies Corp. ('SpaceX'). The fund principal solicited capital from an affiliate of a publicly traded entity headquartered in the People's Republic of China. The investor bargained for the right to make specific disclosures, including the name of the investment. When the investor made those disclosures, the Chinese media eagerly covered the investor's involvement with a high-profile American company.

SpaceX saw the coverage and was not happy. SpaceX believed the coverage created problems for its ability to compete for sensitive government contracts. SpaceX told the fund manager that he would not be able to buy SpaceX shares if the investor remained in the fund.

The fund principal quickly complied. Relying on a contractual provision in the fund's governing document, he kicked the investor out of the fund and returned its capital contribution.

Now the investor was not happy. It sued the fund, the fund manager, and the fund principal claiming breaches of fiduciary duty and breaches of contract. This post-trial opinion rules in favor of the defendants on all but one claim.

The lone claim on which the investor prevailed is for breach of the duty of candor. When the fund principal spoke with the investor after SpaceX's decision, he was not candid. But that breach did not lead to any meaningful loss for the investor or benefit for the fund principal. The investor can recover nominal damages for the breach.

## I. FACTUAL BACKGROUND

The facts are drawn from the post-trial record. Trial took place over three days. The parties submitted 810 exhibits, lodged eight depositions, and reached agreement on seventy-six stipulations of fact. Six witnesses testified live.[1]

The plaintiff bore the burden of proving facts by a preponderance of the evidence, The defendants faced a higher burden, because Iqbaljit Kahlon spoliated evidence. He largely communicated through ephemeral messaging services and failed to turn off his auto-delete function, resulting in the loss of many electronic communications. As a sanction, the court increased Kahlon's burden of proof from a preponderance of the evidence to clear and convincing evidence.[2]

After evaluating the credibility of witnesses and weighing the testimonial and documentary evidence as a whole, the court has used those burdens of proof to make the following findings.

### A. Kahlon and His Business

In 2016, Kahlon formed Tomales Bay Capital, L.P. ("TBC"), an investment adviser registered with the SEC and FINRA. Kahlon is TBC's managing partner,

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "PTO ¶ __." refer to paragraph in the pre-trial order. Citations in the form "JX __ at __" refer to trial exhibits. Citations in the form "Dkt. __" refer to docket entries in this action.

[2] *See* Dkt. 232 at 81.

chief compliance officer, and sole decisionmaker. He and his family trust are its sole owners.

Through TBC, Kahlon forms and manages investment funds that serve as special purpose vehicles for acquiring shares in technology companies, most of which are privately held. Kahlon's bread and butter has been creating funds that serve as special purpose vehicles for acquiring shares in SpaceX.[3]

SpaceX is privately held, so investors cannot buy its shares on the open market. SpaceX also has a right of first refusal ("ROFR") on any shares that are offered for sale, enabling SpaceX to control who acquires its shares.[4] But existing investors (including SpaceX employees) often want liquidity, so SpaceX works with intermediaries to assemble groups of investors to buy shares from those who want to sell. The intermediaries pool the investors' capital in a fund that the trusted intermediary controls. The fund purchases the SpaceX shares. Once an investment vehicle becomes a SpaceX stockholder, however, SpaceX has no legal ability to control sales of equity interests in the fund.[5] Hence the need for SpaceX to work with a small group of intermediaries that it trusts.[6]

---

[3] *See* PTO ¶ 37.

[4] Johnsen Tr. 188, 195–96; *accord* JX 9 at19.

[5] *See* Johnsen Tr. 167–68; *see also* JX 531 at 49; Kahlon Tr. 219–20.

[6] *See* Kahlon Tr. 207–08; JX 38 at 6.

Kahlon gained trusted status by leveraging his connections to the Founders Fund, Peter Thiel's venture capital firm and one of the first investors in SpaceX.[7] Roughly a decade ago, Kahlon convinced Thiel to sell him some SpaceX shares.[8] Kahlon then met the SpaceX insiders, including CFO Bret Johnsen, and developed a "close" relationship with them.[9]

That close relationship has made Kahlon a rich man. Due to the relative scarcity of SpaceX shares, Kahlon has been able to charge high fees for access. For the fund at issue, Kahlon charges most of the limited partners a 2% annual management fee, plus a carried interest giving him 20% of the upside.[10] Kahlon also hopes to leverage the SpaceX relationship to facilitate investments in other Musk-affiliated companies.[11]

SpaceX has unwritten preferences for who it wants as beneficial owners of its shares. Before November 2021, Johnsen told Kahlon that SpaceX prefers not to have investors based in the People's Republic of China, citing regulatory and political

---

[7] *See* Johnsen Tr. 167–68; Kahlon Tr. 206–08.

[8] *See* Kahlon Tr. 206; Kahlon Dep. at 76.

[9] Kahlon Tr. 206–08.

[10] See JX 535 §§ 4.3, 5.2(a)–(b), 9.1 [hereinafter "LP Agreement" or "LPA"]; accord JX 36 (attaching template LP Agreement with the same economic terms); see also JX 446 ¶ 53; JX 306 at 14; JX 536.

[11] Kahlon Tr. 313–14; *see also* JX 17 at 17.

4

concerns.[12] Even so, Kahlon understood that "it is acceptable to have those investors if the investments are structured properly," such as by setting up an intermediate structure using entities from Hong Kong or the Cayman Islands.[13] Over the years, Kahlon had "investors in its funds acquiring SpaceX shares that originated from China."[14] Before the events giving rise to this case, he had never had a Chinese investor whose shares were listed publicly on an exchange.[15]

SpaceX expects its trusted fund managers to start a conversation about any potentially controversial investors before accepting them into a fund. SpaceX also expects its trusted fund managers to identify any disclosure requirements that the investors may have.[16] Although SpaceX does not want to be surprised, the company has always permitted legally required disclosures.[17] Consistent with this approach, many investors have disclosed their investments in SpaceX, including Kahlon himself.[18]

---

[12] Johnsen Tr. 170, 199.

[13] Kahlon Tr. 212.

[14] *Id.* at 213.

[15] Kahlon Tr. 213, 304; *see also* JX 536; JX 537.

[16] *Id.* at 173, 177, 191; *see also* JX 42.

[17] Kahlon Tr. at 202.

[18] *See* Kahlon Tr. 315–19; *see, e.g.*, JX 305; JX 324; JX 338; JX 1023; JX 1024; JX 1026; JX 1030; JX 1032; JX1033.

5

Kahlon relies on a number of third party firms to locate potential investors for his funds. In exchange, they receive a finder's fee calculated as a percentage of the investment. One of those firms is Gulf Asia Venture Group ("Gulf Asia"), where Kahlon works with Farhan Hussain and George Yang.[19] Gulf Asia also introduced Kahlon to Kirkland & Ellis LLP, the firm he uses as outside counsel, where Hussain connected Kahlon with Kamran Bajwa, a Kirkland partner whom Hussain has known since high school.

## B. Gulf Asia Contacts Leo Group.

The transaction at issue has its roots in a dispute between SpaceX and Suhail Rizvi, one of its existing investors. Johnsen viewed Rizvi as "persona non grata" after he leaked SpaceX financials to *The Wall Stret Journal*.[20] Johnsen had not let Rizvi's fund buy any more SpaceX shares, but his fund continued to own shares valued at $528 million (the "Rizvi Shares"). Johnsen thought Kahlon would be a "better custodian of these shares" and wanted Kahlon to buy them.[21] Sensing opportunity,

---

[19] The investors pay the finder's fee, but it was apparent that Gulf Asia's interests were aligned with Kahlon's and that Gulf Asia sought to support him in this litigation. *See* JX 531.

[20] Kahlon Tr. 218–20.

[21] Kahlon Tr. at 221; see JX 75 at 6..

Kahlon was determined to "deliver and take it all."[22] He set up several investment vehicles and tasked Gulf Asia with finding investors.[23]

The fund at issue is Tomales Bay Capital Anduril III, L.P. (the "Fund"). Its general partner, Tomales Bay Capital Anduril III GP, LLC ("General Partner"), manages the Fund. Kahlon is the General Partner's managing member. For Fund decisions, all roads lead to Kahlon. Kahlon also formed a second vehicle that would pool its capital with the Fund through an aggregator vehicle to acquire the Rizvi Shares.[24]

In early October 2021, Gulf Asia contacted Steven Xubo Zhang about investing in the Fund. Zhang is a director and vice president of Leo Group Co., a firm headquartered and organized under the laws of the People's Republic of China. Leo Group has two main lines of business: manufacturing and digital marketing.[25] It also has segments devoted to industrial and financial investment.[26] Leo Group's shares trade publicly on the Shenzhen Stock Exchange, a major Chinese stock exchange.

---

[22] JX 75 at 6.

[23] *See generally* JX 531.

[24] The other fund is Tomales Bay Capital Anduril II, L.P. The aggregator is TBC Dragon Investments VI, L.P. Kahlon controls those entitles as well. JX 76; JX 184; JX 541 at 4.

[25] JX 449 at 2.

[26] *Id.* at 3.

7

Gulf Asia told Zhang that the Fund expected to buy a block of SpaceX stock at $560 per share. After Zhang expressed interest, Kahlon, Gulf Asia, and Zhang had a zoom meeting to discuss matters further. The meeting mostly concerned SpaceX's prospects and the economic terms of the Fund.[27]

During the meeting, Zhang noted that if Leo Group invested, then the rules of the Shenzhen Stock Exchange would require that Leo Group "issue a public announcement" and that "the public announcement would set out the terms of the contract and also give information on the GP and the LPs."[28] Kahlon initially observed that "it would be best not to disclose the name of SpaceX or information concerning the other LPs in the SPV" because "[t]hey deemed that information to be quite sensitive"[29] Kahlon never hinted that either the Fund or SpaceX would object to a regulatory disclosure. [30] He did not suggest that SpaceX had any reluctance about Chinese investors. He also did not say that he needed to check with SpaceX before letting Leo Group invest. Nor did the parties discuss any power Kahlon would have to remove a limited partner.

---

[27] JX 38 at 6–10; *accord* JX 54.

[28] Zhang Tr. 18; *see also* JX 38 at 9–10.

[29] Zhang Tr. 18; *see also* JX 38 at 10, 13.

[30] *See* Zhang Tr. 19.

## C. The Negotiated Disclosure

Leo Group wanted to invest, and Kahlon wanted their capital, so the next step was to negotiate terms. Kahlon primarily relied on Gulf Asia to relay his understanding of the deal to Zhang. Kahlon communicated principally through ephemeral messaging services with Gulf Asia. He intermittently enabled the auto-delete setting, so many of his messages with Gulf Asia were lost.[31]

On November 11, 2021,[32] Zhang of Leo Group asked Yang of Gulf Asia for some basic information about the Fund and the deal to "prepare[] board materials and announcement materials."[33] Yang forwarded the questions to Kahlon.[34]

Several hours later, Leo Group's lawyers at MagStone Law LLP emailed Kahlon and asked him to address similar issues. They called out Leo Group's regulatory obligation to disclose the name of the Fund, its general partner, its fund manager, and the nature of the investment—acquiring shares of SpaceX.[35] MagStone

---

[31] *See* Dkt. 232 at 78–80.

[32] The authors of texts and emails in this case lived in different time zones: Pacific Daylight or Standard Time (UTC−7 or UTC −8), and China Standard Time (UTC +8). Different versions of the same communications therefore bear different times and dates. The parties helpfully tried to use Pacific Time, and this decision follows their lead.

[33] JX 74 at 8.

[34] *Id.*

[35] *See* JX 72 at 1.

9

attached a draft side letter that waived restrictions on Leo Group providing the Fund documents to Chinese authorities.[36]

After a few hours. Kahlon answered MagStone's questions. He noted that his lawyers "will be adding a side letter clause stating that the investor must seek [the General Partner's] consent for any disclosures."[37] Kahlon also stated that he would have his lawyers work with Leo Group "to make sure we are disclosing the minimum that will pass the requirements on their side."[38] MagStone forwarded Kahlon's reply to Zhang.[39]

Yang and Zhang agreed that making a regulatory disclosure would be fine but the disclosure should be minimized.[40] Zhang noted that although Leo Group might initially get away with identifying the investment target as an "internationally leading company in the field of commercial aviation and aerospace," the Shenzhen Stock Exchange would likely ask for clarification, so it would be better to identify

---

[36] *Id.* at 1, 3–4.

[37] JX 64 at 1.

[38] *Id.*

[39] JX 71 at 4.

[40] JX 74 at 9–10.

SpaceX up front.[41] Yang said that was "fine," as long as the disclosure "complies with the minimum requirements of the China Securities Regulatory Commission."[42]

On November 12, 2021, MagStone described Leo Group's disclosure obligation to Kirkland, stating:

> [A]s a public company, our client has to fulfill its obligations to disclose certain information of this investment to China Securities Regulatory Commission and other relevant PRC governmental agencies. We also understand that the fund is sensitive to any investor disclosure and currently is enforcing a strict non-disclosure policy. To meet both parties' requirements, could you please advise what scope of disclosure made by our client for fulfilling its regulatory obligations would be acceptable to the fund? [43]

MagStone thus directly asked Kirkland to address "what scope of disclosure . . . would be acceptable . . . ?"

Kahlon had worked with Chinese investors before, but he had never taken an investment from a Chinese public company. [44] He had no experience with the regulatory filings that Chinese public companies must make, nor with rules of the Shenzhen Stock Exchange. Kahlon is not a lawyer, and he lacked any meaningful knowledge of Chinese law.[45]

---

[41] *Id.* at 9.

[42] *Id.* at 10.

[43] PTO ¶ 54; *accord* JX 65 at 2–3.

[44] Kahlon Tr. 213, 304; *see also* JX 536; JX 537.

[45] *Id.* at 304.

11

Within an hour, MagStone followed up, iterating that Leo Group needed to disclose "at least" five items, including the "Name of the Fund, GP, Management Company, and SpaceX."[46] MagStone also stressed that agreeing on permissible disclosures was a gating issue for Leo Group: "[I]f the fund cannot agree to the disclosure scope as I mentioned (i.e., the specific items), please let me know as soon as possible. Due to regulatory concerns, we may not have sufficient wiggle room to compromise on those specific items."[47]

Kirkland reiterated that the side letter would address these matters.[48] Before sending back the revised draft, a Kirkland associate forwarded MagStone's emails to Carol Liu, an investment funds partner in Kirkland's Hong Kong office. The two exchanged six emails over about three hours, but the defendants redacted the substance, invoked privilege, and refused to let their witnesses testify about the contents.[49]

Kirkland then sent MagStone a revised side letter.[50] MagStone promptly responded that "[t]he revised side letter does not address our specific concern"

---

[46] JX 65 at 1–2.

[47] *Id.* at 1.

[48] *Id.* at 1.

[49] JX 63 at 1–3.

[50] JX 70 at 1, 6.

because there was not "any provision addressing the disclosure scope."[51] MagStone also asked to remove a requirement that Leo Group obtain an legal opinion to the effect that disclosures were required by law. [52]

On the evening of November 12, 2021, Yang of Gulf Asia suggested that Leo Group prepare a document for Kirkland's review spelling out the minimum that it needed to disclose.[53] Zhang liked that approach and told Yang he would send the disclosure to him first.[54] Zhang expressed surprise at how difficult the negotiations had been, but Yang assured him that Kahlon "says it's not a big problem to mention the fund or SpaceX."[55]

On November 13, 2021, Zhang sent the proposed disclosure to Yang. It was almost entirely in Mandarin and titled "Information To Be Disclosed in the Announcement of Leo Group."[56] Yang forwarded it to Kahlon without translation, describing it as the announcement Leo Group "will send to China Securities Regulatory Commission (CSRC)."[57] The Mandarin text contemplated Leo Group

---

[51] JX 73 at 1.

[52] *Id*.

[53] JX 83 at 10.

[54] *Id.*

[55] *Id.*at 13–14.

[56] PTO ¶ 55; JX 92 at 13; *see also* JX 92 at 9–11; *accord id.* at 20–22; JX 77 at 6–8.

[57] PTO ¶ 55; JX 77 at 1–4; *accord id.* at 6–8; JX 92 at 20–22.

13

disclosing that "Leo Investments will invest US$50 million in Tomales Bay Capital Anduril III, L.P." [58] It also contemplated disclosing that the Fund "will invest exclusively in the SPACE X [sic] project."[59] Even in the Mandarin version, "SPACE X [sic]" and the full name of the Fund appeared in English.[60]

Kahlon used Google Translate to convert the document into English, reviewed it, then sent it to Kirkland with a long cover email.[61] The defendants redacted the substance of the communication, invoked privilege, and refused to allow their witnesses to testify about its content.[62]

About two hours later, MagStone sent an English transaction to both Kahlon and Kirkland. The translated title was "Intended Disclosure."[63] MagStone wrote:

> To assist K&E team and TBC in evaluating the disclosure issue, please see attached a draft of intended disclosures to be made by Leo for its regulatory compliance purposes. Our client believes only some basic information re Fund, GP, management of the Fund, and distribution are contemplated therein. Please consider.[64]

---

[58] JX 92 at 20; *accord* JX 77 at 6.

[59] JX 92 at 20; *accord* JX 77 at 6.

[60] *Id.* at 9; *accord* JX 77 at 2.

[61] JX 78 at 1, 16; Kahlon Tr. 246–47.

[62] *See* JX 78 at 1, 16; Kahlon Tr. 354–55.

[63] JX 81 at 1, 9–10.

[64] PTO ¶ 55; *accord* JX 81 at 1, 9–10.

The transaction stated in English that the "[o]bjective" of the investment was to "invest into Space Exploration Technologies Corp., ('SpaceX').'"[65]

Kirkland had been working on the version of the disclosure it received from Kahlon, so Kirkland was able to quickly send back a revised copy of the draft side letter. That draft attached the Mandarin document from Zhang, without any revisions, as Exhibit A.[66] Kirkland's proposed language in the side letter stated:

> Notwithstanding anything to the contrary in Section 7.12(a) of the Partnership Agreement, to the extent that the Investor is required by law to do so, the Investor may disclose the information described in Exhibit A without the consent of the General Partner and without delivering an Opinion of Limited Partner's Counsel to the General Partner pursuant to Section 7.12(a) of the Partnership Agreement.[67]

In the cover email, Kirkland called out that modification, explaining "[w]e also have provided that the requirement for a legal opinion will be waived in connection with the disclosure contemplated by new Exhibit A (which we understand summarizes the legally required disclosure)."[68]

That was it. MagStone sent back a revised side letter later that night without substantive revisions.[69] On November 14, 2021, Kirkland accepted that draft as the

---

[65] JX 81 at 9.

[66] PTO ¶ 55; JX 76 at 1, 12–14, 20–22; *accord* JX 77 at 2–4, 6–8; JX 92 at 9–11, 20–22.

[67] JX 76 at 8, 25.

[68] *Id.* at 1.

[69] JX 80 at 1, 20.

execution version (the "Side Letter").[70] The parties did not heavily negotiate any other terms.

The final closing documents consisted of the LP Agreement, a subscription agreement, and the Side Letter with Exhibit A. The parties executed the documents on November 15, 2021. With the execution of the documents, Leo Group became a limited partner in the Fund.[71] Leo Group promptly wired its $50 million capital contribution to the Fund.

Kahlon did not anticipate any problems with Leo Group's investment. Based on his past collaboration with SpaceX, Kahlon believed that having Leo Group as an indirect investor would be acceptable.[72] He had taken on investors from China and knew other intermediaries that had done the same.[73] The investment would be made through a non-mainland Chinese vehicle, and SpaceX did not have any official policy against investors from China.[74] Kahlon did not tell Leo Group that he needed to

---

[70] JX 90 at 1

[71] Technically, the investor was plaintiff Leo Investments Hong Kong Limited, a limited liability company organized under the laws of Hong Kong (the "Investment Vehicle"). The Investment Group is an indirect, wholly owned subsidiary of Leo Group. Although the distinctions between Leo Group and the Investment Vehicle remains important for many reasons, they are not critical to this case. This decision refers for simplicity to Leo Group.

[72] *See* Kahlon Tr. 206–09, 212.

[73] *Id.* at 213.

[74] *Id.* at 212; Johnsen Tr. 169.

16

discuss the investment with SpaceX before closing, nor did he suggest that Leo Group make any effort to minimize media coverage when announcing the investment.

Kahlon did not consult with SpaceX before admitting Leo Group to the Fund, much less inform SpaceX about the Side Letter containing Leo Group's authorized disclosures.[75] He did not usually disclose the identities of his limited partners to SpaceX, and SpaceX did not require that he do so.[76] And despite having been directly involved in negotiating the Side Letter, agreeing to Leo Group's intended public disclosure in Exhibit A, and participating in discussions about its contents with Gulf Asia and Kirkland, Kahlon somehow did not think that a disclosure by Leo Group was imminent. Strange as that might seem, it did not occur to him, perhaps because he had not previously had a Chinese public company as an investor.

Evidencing his lack of concern about Leo Group's involvement, Kahlon used the investment to solicit other Chinese investors.[77] After signing the deal with Leo Group, Kahlon contacted Lance Liu, an investor and "friend" based in China, and asked if he had "any folks interested in spcex [sic] still?"[78] Kahlon added: "If it helps we just got a 50m [sic] check from LEO.cn [sic] between us. So might help with folks

---

[75] *See* Johnsen Tr. 180–83.

[76] Kahlon Tr. 211, 248.

[77] *Id.* at 368–69.

[78] JX 101 at 1.

17

in terms of speed. I don't know if leo [sic] is well known in China but it's a 18b[illion] business."[79]

## D. Leo Group Makes The Agreed-Upon Announcement.

On November 16, 2021, at 6:36 p.m. HKT (2:36 a.m. PST), Leo Group filed the agreed-upon disclosure as an announcement with the Shenzhen Stock Exchange.[80] The announcement tracked the disclosures in Exhibit A to the Side Letter.[81]

The announcement drew considerable media attention, both because of SpaceX's renown and the large size of the investment. Multiple media articles generated millions of views.[82] All of the reports attached Leo Group's announcement. The body of the reports included information from the announcement, added the reporter's own spin, and occasionally included a comment from Leo Group.

Kahlon has asserted that Leo Group affirmatively sought to publicize its investment and has equated that with a breach of the confidentiality provision in the LP Agreement (the "Confidentiality Provision").[83] That provision governs unauthorized disclosure of information; it does not address the dissemination of

---

[79] *Id.* at 1–2.

[80] PTO ¶ 63; *accord* JX 105; JX 453.

[81] *See* JX 105; JX 100; *see also* Dkt. ¶ 5.

[82] *See, e.g.*, JX 156; JX 163; JX 193.

[83] *See* LP Agreement § 7.12(a).

information that has been made public because of a disclosure required by law.[84] And here, Kahlon and the Fund had agreed to the disclosure that Leo Group made.

Regardless, Leo Group did not seek to publicize any information beyond the agreed-upon scope. Leo Group placed one news story on several media platforms through its public relations firm, Golden Wheat.[85] The piece was titled "Leo Group Co., Ltd. invests US $50 million in SpaceX to explore new investment track."[86] The contents were spare. It began by stating that Leo Group had invested in the Fund to purchase SpaceX stock using language from Exhibit A. It then added a paragraph describing of SpaceX, drawn from public sources.[87] It concluded with a paragraph touting Leo Group's general investment capabilities and its other holdings in the technology sector.[88]

Zhang testified credibly that Leo Group used its public relations firm to place the story primary to circulate factual information about the announcement and limit

---

[84] Kahlon claims that this obligation arises from a limited partner's general obligation "keep confidential and . . . not disclose . . . any information or materials regarding the Partnership Entities or the other Partners or Parallel Fund Partners (whether or not such information or materials have been designated by the General Partner as Confidential Information)." LP Agreement § 7.12(a). But once information has been disclosed as required by law, it cannot be kept confidential, and any further sharing of the public information is not an act of disclosure.

[85] *See* JX 110 at 5; JX 139 at 5.

[86] JX 110 at 5; JX 139 at 5; *see, e.g.*, JX 2004.

[87] *See also* Zhang Tr. 139.

[88] JX 2004 at 6.

market speculation.[89] The story did not contain Confidential Information under the LP Agreement.[90] Zhang also instructed Leo Group's representatives to minimize response to financial press inquiries and not to "disclose anything beyond the scope of the announcement."[91]

On November 16, 2021, Kahlon saw one of the news articles. Even though he was involved throughout the negotiation of the Side Letter and the Exhibit A, had agreed to Leo Group's contemplated public disclosure, and participated in discussions of its contents, Kahlon was genuinely surprised by the announcement.[92]

Kahlon's first instinct was to try to push the deal through. To that end, he quickly took three steps.

First, Kahlon sent the Fund's stock purchase agreement to SpaceX to start the thirty-day clock for SpaceX to exercise its ROFR.[93] Rizvi wanted to close on selling

---

[89] Zhang Tr. 39; *see also* JX 139 at 5 (Golden Wheat reporting to Leo Group on media report coverage).

[90] Kahlon asserted unpersuasively that the story contained confidential information. That is not true. The information was public because Leo Group had made the agreed-upon disclosure as required by law.

[91] *See* JX 1049 at 14–15, 17 (Zhang instructing Leo Group representative: "Just those. That's it. In line with the content of the announcement. Don't disclose anything beyond the scope of the announcement. Just don't let him talk nonsense, and it'll be fine.").

[92] JX 121 at 3 ("F***[,] Leo announced it[.] M*****f*****s.").

[93] JX 184 (proposing to purchase 357,143 shares for $200m and 587,475 shares for $329m on November 29, 2021, and December 15, 2021, respectively); JX 261 (correcting typo in closing dates); JX 541 (proposed structure); JX 531 at 48–49

the Rizvi Shares by year end for tax reasons, and SpaceX had thirty days in which to exercise its ROFR, so Kahlon wanted to start the ROFR clock. Assuming SpaceX waived its ROFR, Kahlon expected that the Fund would buy an initial block of shares on November 29, then a second block of shares on December 15.[94]

Second, Kahlon asked Leo Group to contain the media attention. Even though Leo Group had bargained for the right to make the agreed-upon disclosure and then did what it bargained for the right to do, Leo Group accommodated Kahlon's request.[95] Leo Group convinced many of the media platforms to take down or minimize circulation for the articles discussing the investment.[96] Leo Group also asked the Shenzhen Stock Exchange and the local office of the Securities Regulatory Bureau to make any requests for further information on a confidential basis.[97] Yang told Zhang that Kahlon appreciated the Lego Group's efforts:

> He has . . . seen [Leo Group's] efficiency and sincerity . . . and is particularly grateful for the support [Leo Group] has given him. For now, the spacex [sic] management has not raised any questions to him. Now is the critical moment for TBC Fund and SpaceX to close this round of financing. . . . He has been busy with this matter for the past few days.

---

(texting Hussain that "Pray for me over the next 24 hrs. Sent spa [sic] to cfo [sic] for signing. . . . Pray that spa [sic] signs [sic]. Once it is signed I will feel way better. Not that it can't blow up then."); JX 155 at 1 (Kahlon: "Sent spa to company for signing. Hope this doesn't below [sic] up." Bajwa: "[Praying hand emoji].").

[94] JX 261 at 2.

[95] *See* JX 2015 at 8; Zhang Tr. 46–47, 98–99.

[96] *See e.g.*, JX 147; JX 149; JX 150; JX 152; JX 172; *see also* Zhang Tr. 47.

[97] *See* JX 171; JX 173; *see also* JX 176 at 15.

21

[Kahlon] hopes that we will continue to pay attention to the media in these days. Protect him.[98]

Third, Kahlon and Gulf Asia began looking for investors to replace Leo Group if SpaceX objected. Kahlon thought the deal was "gonna die" and they would need to replace Leo Group.[99] He also wondered about his own relationship with SpaceX and whether he would "survive this."[100] But Kahlon said nothing to SpaceX, hoping SpaceX would not find out.

It did.

## E.    SpaceX Notices The Chinese Press Coverage.

On November 19, 2021, SpaceX's head of governments affairs in Washington D.C. noticed the Chinese press coverage. He sent Johnsen a link to an English language article titled "Elon Musk gets backing from a prolific Chinese tech investor."[101] The article cited Leo Group's announcement, noted that Leo Group had invested through a fund, briefly described SpaceX and Leo Group, and commended Leo Group for investing in a visionary technology company.[102] Except for the compliment, Kahlon had approved each detail by signing off on Exhibit A.

---

[98] JX 176 at 14; *see also* Zhang Tr. 47.

[99] JX 531 at 53 ("Bro I think this deal is gonna die. We need to find capital fast. To replace Leo [sic].")

[100] *Id.* at 56 ("No communication from company which [sic] also messes with me . . . I don't know if I will survive this.").

[101] *See* Johnsen Tr. at 198–99; JX 183 at 2.

[102] JX 183 at 3.

For Johnsen, the title of the article alone created problems: SpaceX's competitors for sensitive government contracts could attack SpaceX its "backing" from a Chinese investor. Johnsen emailed Kahlon with the subject line "Leo Investments?" [103] The body of the email included a link to the article and asked "What is this?"[104]

Kahlon immediately called Johnsen. Neither recalls the exact words that were used, but Johnsen expressed his surprise and displeasure. [105] He particularly discussed why the headline's suggestion that SpaceX had "backing" from Leo Group presented problems for SpaceX. [106] Johnsen also alluded to concern that the investment could trigger review by the Committee on Foreign Investment in the United States, known as CFIUS. SpaceX's head of government affairs had flagged that possibility, and Johnsen passed it on.[107]

Kahlon blamed the media attention on Leo Group. He did not tell Johnsen that the disclosure was legally required. He did not mention that he knew about the disclosure and authorized it in advance. He did not recount the four days spent on hammering out disclosure terms, the Side Letter, or the agreed-upon disclosure

---

[103] JX 183 at 1.

[104] *Id.* at 1–3.

[105] Johnsen Tr. 186, 188.

[106] *Id.* at 184.

[107] Kahlon Tr. 262.

documented in Exhibit A. He did not explain that Leo Group's announcement faithfully tracked the agreed-upon disclosure.[108] Johnsen did not learn any of these facts until his deposition in this litigation.[109]

For Kahlon, setting up Leo Group to take the blame was part of the plan. He wanted to preserve his relationship with SpaceX. As he later explained his hope in a text message to Hussain, "[S]x [sic] is gonna blame leo [sic] on all this. . . . i [sic] should be fine."[110]

Kahlon also did not push back on the CFIUS issue. Kahlon had obtained legal advice on CFIUS risk years before, and he knew that an indirect investment of the size that Leo Group made would not have any CFIUS implications.[111] But he did not correct Johnsen's misperception.

At the end of the call, Johnsen made clear that he would not let the Fund buy SpaceX shares if Leo Group remained a limited partner.[112] He testified:

> Q: [A]fter Leo's disclosure, was there any point at which you were going to allow Leo to invest in SpaceX through Tomales Bay if Leo remained an investor in the fund?
>
> A: No.

---

[108] *See* Johnsen Tr. 187–89.

[109] *Id.*

[110] JX 531 at 74.

[111] Kahlon Tr. 213; Khalon Dep. 686; *see also* Kahlon Dep. 101, 467–68.

[112] Johnsen Tr. 188, 201; *see also* JX 184.

24

. . .

Q: Did you make that clear to Kahlon?

A: I believe I did.[113]

Kahlon left the call with that understanding.[114] Kahlon apologized and assured Johnsen he would "fix it," meaning that Leo Group "would not be investing."[115]

## F.     Kahlon Removes Leo Group From The Fund.

After the call with Johnsen, Kahlon immediately sought to remove Leo Group from the Fund (the "Forced Withdrawal"). Kahlon believed he had to move quickly because SpaceX was deciding whether to exercise its ROFR and, if SpaceX declined, the initial closing was scheduled to take place in ten days—on November 29, 2021. Kahlon also did not think there was any possibility that Johnsen would change his mind. Johnsen had been upset over the media stories, and that coverage could not be changed.

Kahlon first drafted and sent to Gulf Asia a communication plan that involved telling Leo Group that the Fund could not invest in SpaceX unless he removed Leo Group from the Fund.[116] Kahlon spent only about thirty minutes drafting his plan,

---

[113] Johnsen Tr. 203–04, 204. *See also id.* at 201–04 That testimony was credible.

[114] Kahlon Tr. 263–64.

[115] Johnsen Tr. at 186–87.

[116] JX 196 at 3–5.

and he did not seek any input or assistance from counsel.[117] Kahlon admitted during discovery that the plan was "basically bullshit written to make them feel better so they would do what was the right thing to do."[118]

Kahlon did not contemplate taking any responsibility for failing to clear Leo Group's participation with SpaceX in advance. Instead, he would blame the problem on a supposed "cultural gap" resulting in Kahlon "not realizing how disclosures to regulators end [sic] up in a public forum."[119] Kahlon planned to say:

> In the US, funds and their terms and underlying information is never shared with the public such that press can get involved. With SpaceX, no investor ever comments or releases information on any financing. We have never announced that we are invested in SpaceX or ever been in the press concerning SpaceX.[120]

Those statements were not true.

Kahlon also sought to control what, if anything, Leo Group would say about its withdrawal from the Fund. As a starting point, Kahlon wanted to know, "Do you have to disclose to the regulator what happened?"[121] If so, then Kahlon wanted to sign off on the content, telling Leo Group:

---

[117] Kahlon Tr. 391.

[118] Kahlon Tr. 395.

[119] JX 196 at 4.

[120] *Id.* at 4–5.

[121] *Id.* at 6.

26

- If you do, you will need our consent to disclose / use our name. We need to be thoughtful about further press and communication w/ (sic) the regulator to limit damage to you all, us and SpaceX.

- We would like to approve the disclosure to the regulator. We will assume that it will end up in the press.

- Our prefferred (sic) language: "We will no longer be investing in TBC Anduril III, LP [sic]; and therefore we will not be investing in the funds' [sic] target company."[122]

Kahlon took these positions to protect himself and his relationship with SpaceX. He told Gulf Asia that "[i]f they have to give a reason [in a disclosure], we want something very generic like 'market conditions' or something."[123]

On November 20, 2021, Gulf Asia told Zhang that Kahlon intended to remove Leo Group from the Fund, saying that SpaceX insisted.[124] Kahlon, Zhang, and Gulf Asia had a two-hour zoom meeting the next day.[125] During the call, Zhang presented his own analysis of the situation and told Kahlon that Leo Group would "be exposed to harrowing consequences if TBC truly insisted on removing" them from the Fund.[126] But Kahlon had made the decision. He insisted that there was no choice: Leo Group would be "kick[ed] out."[127]

---

[122] *Id.* at 6–7.

[123] *Id.*

[124] JX 208 at 13–17; *see also* JX 200 at 25.

[125] JX 203; Kahlon Tr. 270.

[126] Zhang Tr. 62–63.

[127] *Id.* at 63.

27

Before the call had ended, Kahlon sent Zhang a proposed letter agreement to carry out the removal.[128] The agreement asked Leo Group to commit to an ongoing confidentiality obligation and acknowledge that removal was necessary because Leo Group's "ongoing participation in the [Fund] would impose materially burdensome compliance obligations on both [Leo Group] and the [Fund] under U.S. and/or Chinese regulations."[129]

Leo Group responded with a letter explaining that it could not agree to the ongoing confidentiality obligation and that its withdrawal from the Fund would have serious consequences:

> [O]nce the project is terminated, [Leo Group] will have to publish another announcement in accordance with the stock exchange regulations in China . . . which may result in severe consequences, including (i) investigation by [the] China Securities Regulation Commission, (ii) significantly dropping of our stock price, which may result [in] a trading halt in China and cause huge losses to our investors and expose us to the risk of class actions; and (iii) triggering follow-up reports on the event, which may expected to be larger, more lasting and highly uncontrollable.[130]

The letter urged Kahlon to keep Leo Group in the Fund and to "continue to work with [them] and maintain active communication with SpaceX to help retain [Leo Group's] LP share."[131]

---

[128] *See* JX 202 at 1; JX 203.

[129] *Id.* at 2.

[130] JX 201 at 3.

[131] *Id.* at 4.

Kahlon was unmoved. He invoked a provision in the Fund's LP Agreement and forced Leo Group to withdraw (the "Withdrawal Provision"). He texted Johnsen hours later, writing: "[T]hey are out of our fund."[132] Kahlon then spoke briefly with Johnsen, with Kahlon letting Johnsen conclude that Leo Group was a "bad actor."[133]

On November 22, 2021, Leo Group reiterated its refusal to sign the letter agreement.[134] Kahlon returned Leo Group's funds anyway.[135] Kahlon then turned the letter agreement into unilateral termination letter and sent it to Leo Group.[136] The termination letter cited "materially burdensome compliance obligations" if Leo Group remained in the Fund but did not reference any specific provision of the LP Agreement.

Later than afternoon, Kahlon sent Johnsen a letter purporting to document "what happened."[137]

- The letter claimed the Fund "was established to invest in a portfolio of late stage technology companies."[138] It was not. The Fund was formed to buy the Rizvi Shares.

---

[132] JX 204.

[133] Kahlon Tr. 403.

[134] JX 219.

[135] PTO ¶ 83; JX 226.

[136] JX 218.

[137] Johnsen Tr. 189–190; JX 215.

[138] JX 215 at 2.

29

- The letter claimed "[e]ver since the announcement, [Kahlon] ha[s] worked to remove [Leo Group] from [the] Fund."[139] He had not. Kahlon hoped SpaceX would not notice.

- The letter expressed "regret that this specific investor used their investment with our firm to seek public notoriety given our longstanding relationship with SpaceX." [140] That was not true either. Leo Group made the regulatory disclosure that it bargained for the right to make in the Side Letter.

Johnsen was pleased with the apology.[141]

## G. Leo Group Seeks An Explanation.

On November 23, 2021, MagStone emailed Kahlon contending that the Forced Withdrawal violated the LP Agreement. MagStone asked Kahlon to justify the Forced Withdrawal and provide an "Opinion of the Fund's Counsel or other documentation evidencing that Leo Investments' continuance as a limited partner in the Fund will create a Partnership [R]egulatory Risk, or cause a material adverse effect on the Fund."[142]

Kahlon brought in Kirkland litigators.[143] He sent a Kirkland-drafted reply to MagStone that stated:

> As you note below, it is the reasonable judgment of the GP that your client's status as an LP would result in a significant and adverse delay to the proposed deal we had discussed and therefore we had to exercise our rights under the LPA for a unilateral withdrawal. Please note that

[139] *Id.*

[140] *Id.*

[141] Johnsen Tr. 190.

[142] JX 246 at 2.

[143] *See* JX 272 at 5, 46.

30

I have explained the background to your client which is that the target company for investment simply would not do the deal with our fund if your client remained as an LP given the regulatory, media and other issues that arose. Please also note that under the LPA, as GP, we do not need LP consent for taking such action and the money has already been returned to your client so we consider the matter fully closed."[144]

MagStone then asked Kahlon to provide written evidence that SpaceX would not let Leo Group invest. Neither Kahlon nor Kirkland responded.[145]

## H. Kahlon Tries To Move Forward.

On November 24, 2021, Kahlon gave SpaceX a list of the investors in the Fund.[146] The list omitted Leo Group but included Kirkland.[147]

On November 25, 2021, Leo Group made a public filing about its removal from the Fund.[148] Its stock price dropped 10.11% from the prior day's close.[149]

On December 13, 2021, SpaceX exercised its ROFR on the Rizvi Shares.[150] SpaceX did not exercise the ROFR because of Leo Group's brief involvement in the Fund. Instead, Johnsen told Kahlon that Musk wanted to buy the shares.[151]

---

[144] JX 245 at 2.

[145] *Id.* at 1–2.

[146] JX 1040.

[147] *See id.*

[148] JX 248.

[149] PTO ¶ 66.

[150] JX 273.

[151] Kahlon Tr. 289–90.

Musk did not buy all of the Rizvi Shares.[152] On December 17, 2021, the Kahlon's investment vehicles bought 178,571 shares, representing 19% of the 944,618 shares Kahlon hoped to buy.[153]

About two weeks later, Kahlon sent a letter to the Fund's limited partners implying that SpaceX exercised its ROFR for all of the Rizvi Shares.[154] Kahlon offered the limited partners the opportunity to withdraw from the Fund. Thirteen of seventeen did, taking with them $110 million of the Fund's original $290 million in capital.[155]

Five months later, the Fund purchased more SpaceX shares. On May 26, 2022, the Fund bought 2,571,428 shares at a split-adjusted price of $70.00 per share (after a 10-for-1 stock split).[156] By then, Kahlon had admitted eleven new investors to the Fund.[157]

## I.     This Litigation

On February 23, 2022, Leo Group sued Kahlon, the Fund, and the General Partner. The complaint asserts that the Fund and the General Partner breached the

---

[152] *See* JX 276.

[153] JX 277 at 1; JX 184 at 1.

[154] JX 282; *see, e.g.*, JX 286; JX 287.

[155] JX 286; JX 343.

[156] PTO ¶ 96; *accord* JX 320 at 12.

[157] JX 343 at 3.

LP Agreement by removing Leo Group from the Fund. It also asserts that the General Partner and Kahlon breached their fiduciary duties by removing Leo Group from the Fund.

The defendants moved to dismiss the complaint as failing to state a claim on which relief can be granted. On March 8, 2023, the court denied the motion as to the contract claim but dismissed the fiduciary duty claim.[158] On August 15, the court granted the parties' stipulation for the production and exchange of confidential information (the "Confidentiality Stipulation"). The stipulation contains a forum selection clause binding the General Partner, the Fund, Kahlon, and Leo Group to assert all claims arising out of or relating to the stipulation in this court.[159]

On August 27, 2024, after fact discovery, Leo Group amended its complaint to reinstate its fiduciary claim.[160] The defendants moved to dismiss that claim again, and the court denied the motion on November 4, 2024.[161] The court simultaneously granted partial summary judgment sua sponte in favor of Leo Group, holding that Section 2(a) and (c) of the Side Letter rendered the Confidentiality Provision inapplicable to a disclosure of the information in Exhibit A.[162]

---

[158] Dkt. 29; *see also* Dkt. 30 (TRANSCRIPT).

[159] Dkt. 41 ¶ 30 (ORDER).

[160] Dkt. 167.

[161] Dkt. 185 (ORDER).

[162] JX 523 ¶¶ 5–6.

The General Partner and the Fund filed two suits against Leo Group. On August 6, 2024, as discovery in this case was ending, the General Partner and the Fund filed an action in the United States District Court for the Northern District of California ("California Action").[163] The complaint asserted that Leo Group always intended to announce its investment in the Fund and committed fraud by promising to abide by the LP Agreement.

On November 18, 2024, the General Partner and the Fund filed an action in the Delaware Superior Court (the "Superior Court Action").[164] The complaint asserted the same fraud claim as the California Action while also alleging that Leo Group tortiously interfered with the LP Agreement by causing the Investment Vehicle to announce the investment.

Both of the other cases were stayed pending the outcome of this proceeding. On December 16, 2024, this case proceeded to trial.

## II.    LEGAL ANALYSIS

Leo Group sought to prove at trial that Kahlon and the General Partner breached their fiduciary duties when carrying out the Forced Withdrawal. Leo Group did not succeed in a meaningful way on any of its claims for breach of fiduciary duty. Leo Group proved that Kahlon and the General Partner breached their duty of candor

---

[163] JX 1006.

[164] JX 1005.

when informing Leo Group about the Forced Withdrawal, but that breach only entitles Leo Group to nominal damages of $1.

Leo Group also sought to prove at trial that Kahlon, the General Partner, and the Fund breached the LP Agreement when engaging in the Forced Withdrawal. Kahlon is not a party to the LP Agreement and cannot be liable for breach of that contract. Regardless, Leo Group failed to prove any of its contract claims.

## A.    Breach of Fiduciary Duty

Leo Group sought to prove that the General Partner and Kahlon breached their fiduciary duties when engaging in the Forced Withdrawal. Leo Group's claims failed largely because Leo Group misunderstands the nature of the fiduciary duties that the General Partner and Kahlon owed. They did not owe fiduciary duties to Leo Group; they owed fiduciary duties to the Fund and its partners as a whole.

Leo Group failed to prove a breach of the duty of care or loyalty sufficient to rebut the business judgment rule. Assuming for purposes of analysis that Leo Group had proven a breach, Kahlon's exercise of the Withdrawal Provision was entirely fair to the Fund and its partners as a whole. Under *Nemec v. Shrader*, the General Partner and Kahlon did not owe fiduciary duties to Leo Group when exercising the Withdrawal Provision.[165]

Leo Group proved that the General Partner and Kahlon breached a duty of candor they owed to Leo Group when communicating directly with Leo Group about

---

[165] 991 A.2d 1120, 1129 (Del. 2010).

the Forced Withdrawal. That breach, however, did not cause Leo Group any meaningful harm. Leo Group lacked any ability to avoid the Forced Withdrawal, did have to make any investment decision, and did not take any other action in reliance on the General Partner and Kahlon's misrepresentations and omissions. The General Partner and Kahlon also did not capture any benefit from the breach other than proportionately through the exercise of the Withdrawal Provision, which they exercised properly and in compliance with their fiduciary duties. But in light of the proven breach of the duty of candor, Leo Group is entitled to nominal damages of $1.

### 1. The Governing Law

A claim for breach of fiduciary duty is an equitable tort.[166] The basic elements of a common-law tort are familiar: The plaintiff must prove existence of a duty, a breach of that duty, injury, and a causal connection between the breach and injury that is sufficient to warrant a remedy, such as compensatory damages.

The equitable tort for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty.[167] The first element

---

[166] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see* Restatement (Second) Torts § 874 cmt. b (Am. L. Inst. 1979), Westlaw (database updated Oct. 2024) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct."); *see generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

[167] *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010); *accord ZRii, LLC v. Wellness Acq. Gp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009) (citing *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)).

resembles the corresponding aspect of a common-law tort: The plaintiff must prove

that the defendant owed a fiduciary duty to the plaintiff. The second element departs

from the common law model in significant respects. For a common-law tort, the court

analyzes breach using the standard of conduct that the defendant was expected to

follow.[168] For a breach of fiduciary duty, the court evaluates breach using a standard

of review.[169] The standard of review is always more forgiving towards the defendant

fiduciary and more onerous for the plaintiff beneficiary than the standard of

conduct.[170] Delaware decisions traditionally did not acknowledge the distinction

---

[168] *See generally* Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L. Rev. 437, 461–67 (1993).

[169] *Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35–36 (Del. Ch. 2013); *see also* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002) [hereinafter *Realigning the Standard*]; William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001) [hereinafter *Function Over Form*].

[170] *Chen*, 87 A.3d at 667 ("The numerous policy justifications for this divergence largely parallel the well-understood rationales for the business judgment rule."). For cogent explanations, see *Function over Form*, *supra* note 169 at 1296, and *Realigning the Standard*, *supra* note 1699, at 455, 451–58; *accord* Eisenberg, *supra* note 168, at 461–67; E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1421–28 (2005); Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553–58 (2012). Opinions articulating the policy rationales for applying standards of review that are more lenient than the underlying standards of conduct include *Brehm v.*

between the standard of conduct and the standard of review,[171] but Delaware jurists

now do so openly to explain the divergence between the normative framing of what

fiduciary duties require and their practical application to the facts of a case.[172]

Although a claim for breach of fiduciary duty has only two formal elements, a

beneficiary cannot obtain a meaningful remedy without additional showings that

parallel the other elements of a traditional common-law tort. One is harm to the

beneficiary or a benefit wrongly received by the fiduciary.[173] Another is a sufficiently

*Eisner*, 746 A.2d 244, 255–56 (Del. 2000) and *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (Allen, C.).

[171] *See* David Kershaw, *The Foundations of Anglo-American Corporate Fiduciary Law* 185, 221–22 (2018). Despite the lack of open acknowledgement, the divergence could be seen in earlier cases, such as decisions distinguishing between the articulated duty of directors to exercise reasonable care and the liability standard of gross negligence. *See, e.g.*, *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *In re Walt Disney Deriv. Litig.* (*Disney I*), 907 A.2d 693, 749–50 (Del. Ch 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Professor Kershaw notes that New York cases maintained a similar distinction from the late nineteenth century until the codification of the fiduciary standard of care in 1961. *See* Kershaw, *supra*, at 185–86.

[172] *See, e.g.*, *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759, at *7 (Del. Ch. June 3, 2022) (Glasscock, V.C.); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *15 (Del. Ch. May 31, 2022) (McCormick, C.); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 809 (Del. Ch. 2022) (Will, V.C.); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *30 (Del. Ch. May 6, 2021) (Zurn, V.C.); *Cumming v. Edens*, 2018 WL 992877, at *18 (Del. Ch. Feb. 20, 2018) (Slights, V.C.); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *27 n.202 (Del. Ch. July 24, 2014) (Noble, V.C.); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457–59 (Del. Ch. 2011) (Laster, V.C.); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 (2008) (Parsons, V.C.); *see also Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1275 n.102 (Del. 2018) (Strine, C.J.).

[173] *See Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 838 (Del. 2011) ("[I]t is inequitable to permit the fiduciary to profit from using confidential corporate

convincing causal linkage between the breach and the remedy sought.[174] A court may

award nominal damages when a breach does not warrant a meaningful remedy.[175]

## 2. The Existence Of A Fiduciary Duty

For purposes of this case, the defendants' fiduciary status is straightforward.

The Fund is a limited partnership. The general partner of a limited partnership owes

fiduciary duties to the partnership for the ultimate benefit of the partners, unless the

---

information. Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit."); Doug Rendleman, *Measurement of Restitution: Coordinating Restitution with Compensatory Damages and Punitive Damages*, 68 Wash. & Lee L. Rev. 973, 990 (2011) ("Actual harm to the corporation is not . . . a prerequisite for a plaintiff to state a claim for restitution-disgorgement.").

[174] *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773, 775 (Del. 2006) (explaining that when seeking post-closing damages for breach of fiduciary duty based on false or misleading disclosures, plaintiff must prove a causal link between disclosure violation and quantifiable damages); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, *20 (Del. Ch. July 21, 2017) (finding transaction was entirely fair where controller engaged in acts of unfair dealing, but third party bidder intervened and severed any causal connection between controller's actions and ultimate deal price), *aff'd*, 184 A.3d 1291, 2018 WL 1905256 (Del. Apr. 23, 2018); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 314–15 (Del. Ch. 2013) ("A failure to disclose material information in [the context of a request for stockholder action] may warrant an injunction . . . but will not provide a basis for damages from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders . . . , and (iii) damages proximately caused by that failure.").

[175] *See, e.g.*, *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *2, 19, 25 (Del. Ch. Mar. 21, 2018) (awarding nominal damages for breach of duty); *Lake Treasure Hldgs., Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *1, 9, 13 (Del. Ch. Oct. 10, 2014) (same); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *51 (Del. Ch. Sept. 4, 2014) (same); *Oliver v. Bos. Univ.*, 2006 WL 1064169, *25, 29, 30, 32, 34–35 (Del. Ch. Apr. 14, 2006) (same).

limited partnership agreement eliminates or limits them.[176] The LP Agreement does not eliminate or limit the fiduciary duties that the General Partner owes.

A human who controls a general partner is also a fiduciary.[177] Kahlon controlled the General Partner, making him a fiduciary as well.

Establishing a defendant's status as a fiduciary is only a starting point. As Justice Felix Frankfurter famously observed:

> To say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?[178]

The answers to these questions depend on the facts of each case. Fiduciary duties are "unremitting," meaning that they are always operative, but their application is context-dependent, meaning that "the exact course of conduct that must be charted to properly discharge that responsibility will change in the specific context of the action the [fiduciary] is taking."[179]

---

[176] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012); *see Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *3 (Del. Ch. July 5, 1995) (identifying "general partners" among the relationships that "carry the 'special' nature of a fiduciary relationship"); McMahon v. New Castle Assocs., 532 A.2d 601, 605 (Del. Ch. 1987) (Allen, C.) (same).

[177] *Feeley*, 62 A.3d at 669–70; *In re USACafes, L.P. Litig.*, 600 A.2d 43, 47–50 (Del. Ch. 1991) (Allen, C.).

[178] *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 85–86 (1943).

[179] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

Recall that Delaware law distinguishes between the standard of conduct and the standard of review. The standard of conduct describes what corporate fiduciaries are expected to do and is defined by the content of the duties of loyalty and care.[180] The standard of conduct thus answers Justice Frankfurter's first two questions: To whom does the fiduciary owe obligations, and what obligations are owed?[181] The standard of review is the test that a court applies to the facts of the case to determine whether the fiduciaries have met the standard of conduct.[182] It answers Justice Frankfurter's third question: How has the fiduciary failed to discharge its obligations?[183] The remedy the court imposes answers the fourth question: What are the consequences of the deviation from duty?

### a. The Standard of Conduct

The general partner of a limited partnership owes fiduciary duties that run to the limited partnership for the benefit of the partners as a whole.[184] With rare

---

[180] *Trados II*, 73 A.3d at 36.

[181] *See Chenery*, 318 U.S. at 85–86.

[182] *Trados II*, 73 A.3d at 35–36.

[183] *Chenery*, 318 U.S. at 85–86.

[184] *Zoren v. Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch. 2003) ("Undoubtedly, a corporate general partner and the directors of that general partner owe a fiduciary duty of loyalty to a limited partnership and its limited partners."); *In re Bos. Celtics Ltd. P'ship S'holders Litig.*, 1999 WL 641902, at *4 (Del. Ch. Aug. 6, 1999) ("It is well settled that, unless limited by the limited partnership agreement, the general partner of a Delaware limited partnership and the directors of a corporate General Partner who control the partnership, like the directors of a Delaware

exceptions, a general partner does not owe fiduciary duties to an individual limited partner. [185] Just as directors owe fiduciary duties to the corporation and the undifferentiated equity,[186] the general partner owes duties to the limited partnership and the undifferentiated partnership interest.

Only rarely will a general partner and its human controller owe duties to a particular partner or subset of partners. For purposes of this case, the only setting where Kahlon and the General Partner owed fiduciary duties to Leo Group itself— rather than the Fund and its partners as a whole—was when they chose to speak to Leo Group. The General Partner and Kahlon did not owe fiduciary duties to Leo

---

corporation, have the fiduciary duty to manage the partnership in the partnership's interests and the interests of the limited partners." (footnotes omitted)); *Sonet v. Timber Co., L.P.*, 722 A.2d 319, 322 (Del. Ch. 1998) ("Delaware's limited partnership jurisprudence begins with the basic premise that, *unless limited by the partnership agreement,* the general partner has the fiduciary duty to manage the partnership in its interest and in the interests of the limited partners."); *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del. Ch. 1981) ("[I]t is clear that the general partner in a limited partnership owes a fiduciary duty to the limited partners."); Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1470 (2005) ("[A] general partner owes fiduciary duties to both the limited partnership and to the limited partners of the limited partnership.").

[185] *Cf. Nemec*, 991 A.2d at 1129 (holding that directors did not owe any fiduciary duties to retired executives in their capacities as stockholders when exercising a redemption right); *Riblet Prods. Corp. v. Nagy*, 683 A.2d 37, 40 (Del. 1996) (holding that directors did not owe any fiduciary duties to employee as stockholder for purposes of exercising termination right); *McRitchie v. Zuckerberg*, 315 A.3d 518, 550 (Del. Ch. 2024) (discussing director duties towards stockholder collective versus duties towards individual stockholders).

[186] *McRitchie*, 315 A.3d at 550 (discussing director duties towards stockholders qua residual claimants).

Group when exercising the Withdrawal Provision. When making that decision, they owed duties to the Fund and its partners as a whole.

A general partner owes fiduciary duties of loyalty and care.[187] The duty of loyalty requires that the general partner act without any conflicts of interest that would impair its ability to act in the best interest of the partnership and its partners. The duty to act loyally includes an obligation to act in good faith, which means the general partner must seek subjectively to promote the best interests of the partnership. Stated in the contrapositive, a general partner acts in bad faith when acting with a purpose other than advancing the best interests of the partnership. The duty of care requires that the general partner exercise a level of care no less than that of a director of a corporation.[188]

The Delaware Limited Partnership Act does not restrict service as a general partner to natural persons, opening the door to entities serving in that role.[189] This

---

[187] *Bos. Celtics*, 1999 WL 641902, at *4 ("Delaware law requires the general partners of limited partnerships to exercise due care and to act in the best interest of the partnership and the limited partners.").

[188] *See Boxer*, 429 A.2d at 997.

[189] *See* 6 *Del. C.* § 17–101(7) ("'General partner' means a person who is named as a general partner in the certificate of limited partnership or similar instrument . . . and who is admitted to the limited partnership as a general partner . . . ."); *id.* § 17–101(16) (" 'Person' means a natural person, partnership (whether general or limited), limited liability company, trust . . . , estate, association . . . , corporation . . . or any other individual or entity (or series thereof) . . . ."). *See generally* Robert W. Hamilton, *Corporate General Partners of Limited Partnerships*, 1 J. Small & Emerging Bus. L. 73 (1997) (discussing the origins and implications of corporate general partners).

court soon confronted the question of what to do with the human controllers of an entity fiduciary. In *USACafes*,[190] Chancellor Allen considered whether limited partners of USACafes, L.P., could sue the directors of USACafes General Partner, Inc., its corporate general partner, for breach of fiduciary duty. Defendants Sam and Charles Wyly comprised two of the six directors on the board of the corporate general partner, owned 100% the stock of the corporate general partner, and held 47% of the limited partnership units. In the challenged transaction, USACafes sold its assets to Mesa Acquisition Corp., a third party acquiror, for $72.6 million, representing $10.25 per partnership unit. Metsa allegedly paid an additional $15 to $17 million to the Wylys and the other directors of the corporate general partner in the form of consideration for covenants not to compete, releases of claims, forgiveness of loans, and payments under employment agreements.[191] The defendants conceded that the general partner owed fiduciary duties to the limited partners, but they argued that the members of the board of the corporate general partner only owed fiduciary duties to its stockholders, not to the limited partners.[192]

Chancellor Allen rejected the defendants' argument. Finding no precedent on point, Chancellor Allen started from the general principle that "one who controls property of another may not, without implied or express agreement, intentionally use

---

[190] *USACafes*, 600 A.2d 43.

[191] *See id.* at 45–48.

[192] *Id.* at 51

that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner."[193] He then noted the equitable tradition of looking to the substance of where control lay, observing that "[w]hen control over corporate property was recognized to be in the hands of shareholders who controlled the enterprise, the fiduciary obligation was found to extend to such persons as well."[194] Analogizing the corporate general partner to a corporate trustee, a structure where there was a longer tradition of an entity acting as fiduciary, Chancellor Allen noted that courts held the individuals who controlled or made decisions for the corporate trustee liable for breaches of trust.[195] He concluded that "[t]he theory underlying fiduciary duties is consistent with recognition that a director of a corporate general partner bears such a duty towards the limited partnership."[196]

Chancellor Allen recognized that the resulting fiduciary duty "may well not be so broad as the duty of the director of a corporate trustee."[197] He left to future cases the task of delineating the full scope of the duty, holding only that "it surely entails the duty not to use control over the partnership's property to advantage the corporate

---

[193] *Id.* at 48.

[194] *Id.*

[195] *See id.* at 48–49 (citing A. Scott & W. Fratcher, *The Law of Trusts* vol. 4, § 326.03, at 304–06 (4th ed.1989)).

[196] *Id.* at 49.

[197] *Id.*

45

director at the expense of the partnership."[198] In subsequent decisions involving limited partnerships, this court has followed *USACafes* consistently for loyalty breaches, but has declined to extend the doctrine to breaches of the duty of care.[199] Under established precedent, therefore, the human controller of the general partner does not owe a duty of care, only a duty of loyalty.

### b. The Standard Of Review

When litigation arises, fiduciaries are not judged by the standard of conduct but using a standard of review. Two standards of review are pertinent to this case: the business judgment rule and entire fairness.

When a general partner takes action, Delaware's default standard of review is the business judgment rule.[200] That standard of review affords general partners "a presumption that they acted on an informed basis and in the honest belief that they acted in the best interest of the partnership and the limited partners."[201] Unless a plaintiff rebuts one of the elements of the rule, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach."[202]

---

[198] *Id.*

[199] *See Largo Legacy Gp., LLC v. Charles*, 2021 WL 2692426, at \*14 (Del. Ch. June 30, 2021); *2009 Caiola Fam. Tr. v. PWA, LLC*, 2015 WL 6007596, at \*25 (Del. Ch. Oct. 14, 2015); *Feeley*, 62 A.3d at 670–72; *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at \*10 (Del. Ch. Apr. 20, 2009).

[200] *Zoren*, 836 A.2d at 528.

[201] *Bos. Celtics*, 1999 WL 641902, at \*5.

[202] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[203]

Delaware's most onerous standard of review is the entire fairness test. To trigger entire fairness, the plaintiff must rebut one of the presumptions of the business judgment rule.[204] If the plaintiff meets its burden, then the defendant fiduciary must prove that its conduct was entirely fair.[205] When entire fairness governs, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price."[206] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[207]

---

[203] *See Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." (emphasis in original)).

[204] *Bos. Celtics*, 1999 WL 641902, at *4.

[205] *Id.*

[206] *Cinerama, Inc. v. Technicolor, Inc.* (*Technicolor Plenary IV*), 663 A.2d 1156, 1163 (Del. 1995) (emphases in original) (internal quotation marks omitted).

[207] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

In this case, the analysis starts with the business judgment rule. The question then becomes whether Leo Group proved facts sufficient to rebut the presumptions of the business judgment rule, thereby elevating the standard of review to entire fairness. If Leo Group met its burden, then the burden shifts to Kahlon and the General Partner to prove that their actions were entirely fair.

### i. Leo Group's Attempt To Establish A Conflict Of Interest

Leo Group argues that both Kahlon and the General Partner—functionally synonymous in this context—breached their duty of loyalty when engaging in the Forced Withdrawal. They say Kahlon acted disloyally by seeking to preserve his relationship with SpaceX rather than promoting the value of the Fund. That theory fails because Kahlon's interests were aligned with the Fund's, so serving his own interests equated to acting loyally.

Johnsen's email and call to Kahlon catalyzed the Forced Withdrawal. Coming out of that call, Kahlon believed—both subjectively and reasonably—that Johnsen would not permit the Fund to buy SpaceX shares if Leo Group remained in the Fund. Kahlon also believed—both subjectively and reasonably—that to enable the Fund to acquire SpaceX shares, he needed to get back into Johnsen and SpaceX's good graces. That meant eliminating the problem that Leo Group posed by ending their participation in the Fund.

To be sure, preserving the Fund's ability to acquire SpaceX shares also served Kahlon's self-interest: Through the General Partner, he would earn a 2% management fee and 20% of the upside. That alignment of interests was no accident;

it is one of the justifications for equity compensation. In the corporate context, Delaware decisions presume that a director who is also a stockholder is more likely to have interests that align with the best interests of the stockholders as a whole.[208] As then-Vice Chancellor Strine wrote: "[I]t is useful to have directors with, as Ross Perot was wont to say, skin in the game. Such directors have a personal interest in ensuring that the company is managed to maximize returns to the stockholders."[209] The same is true of general partners and those who control them.

It is equally true that Kahlon's interests were not fully aligned with those of the Fund and the partners as a whole. He wanted to preserve his relationship with SpaceX and the Musk-iverse across time, multiple funds, and every possible Musk-controlled entity. He conceivably might have sacrificed the Fund to protect his long-term relationship. Or he might have prioritized the interests of another fund that he had formed. But he didn't. Here, Kahlon zeroed in on ensuring that the Fund could close the Rizvi Shares transaction to invest in SpaceX shares.

To do that, Kahlon effectuated the Forced Withdrawal. That was not a breach of the duty of loyalty to the Fund and its limited partners, any more so than it

---

[208] *See McRitchie,* 315 A.3d at 553 & n.95 (collecting cases).

[209] *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006); *accord In re Oracle Corp.*, 867 A.2d 904, 930 (Del. Ch. 2004) ("[M]any sophisticated commentators believe that it is a good idea that corporate insiders own company stock because having, as Ross Perot would say, 'skin in the game' will tend to align their interests with those of the public stockholders."), *aff'd*, 872 A.2d 960 (Del. 2005) (TABLE).

constitutes a breach of a director's duty of loyalty to benefit a corporation by exercising a contractual redemption right to the detriment of retired executives who are also stockholders (*Nemec*) or a contractual termination right to the detriment of an executive who is also a stockholder (*Riblet*).[210] Nor is it a breach of duty for directors to take action to avoid triggering contractual rights of preferred stock.[211] Directors fulfill their duties if they benefit the corporation and its stockholders by exercising contractual rights or avoiding contractual obligations, even if a stockholder is the contractual counterparty. The same is true for a general partner and its human controller in a general partnership.

Leo Group failed to prove that Kahlon and the General Partner breached their duty of loyalty when exercising the Withdrawal Provision. That avenue of attack does not rebut the business judgment rule or lead to entire fairness.

---

[210] *See supra* note 185.

[211] *Trados II*, 73 A.3d at 39 (Del. Ch. 2013) ("A board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights."); *see LC Cap. Master Fund, Ltd. v. James*, 990 A.2d 435, 438 (Del. Ch. 2010) ("[O]nce the QuadraMed Board honored the special contractual rights of the preferred, it was entitled to favor the interests of the common stockholders."); *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *7 (Del. Ch. May 28, 2010) ("[R]ights arising from documents governing a preferred class of stock, such as the Certificates, that are enjoyed solely by that preferred class, do not give rise to fiduciary duties because such rights are purely contractual in nature."); *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010) ("[D]irectors do not owe preferred shareholders any fiduciary duties with respect to [their contractual] rights.").

50

### ii.    Leo Group's Attempt To Prove Bad Faith

Leo Group next argues that both Kahlon and the General Partner—again functionally synonymous in this context—breached their duty of loyalty by failing to act in good faith. They again say Kahlon acted disloyally by seeking to preserve his relationship with SpaceX rather than promoting the value of the Fund. This line of attack differs from the prior duty of loyalty argument because while the former examined objectively whether Kahlon and the General Partner fell victim to conflicts of interest that caused them to act contrary to the interests of the Fund and its partners, the current inquiry examines what Kahlon subjectively sought to achieve. Was he seeking subjectively to promote the best interests of the Fund, or was he pursuing some other purpose and thus acting in bad faith?

A plaintiff can rebut the business judgment rule and cause the standard of review to intensify to entire fairness by showing that a fiduciary acted in bad faith.[212] One way that a plaintiff can plead bad faith is by alleging facts which support an inference that the defendant "acted with scienter, meaning they had actual or constructive knowledge that their conduct was legally improper."[213] The necessary

---

[212] *IBEW Loc. Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 619 (Del. Ch. 2023) ("The plaintiff argues that the complaint's allegations support a reasonable inference that the Voting Directors acted in bad faith. That contention, if correct, rebuts one of the presumptions of the business judgment rule, causing the standard of review to shift to entire fairness.").

[213] *McElrath v. Kalanick*, 224 A.3d 982, 991 (Del. 2020) (internal quotation marks omitted).

mental state can range from an "intentional dereliction of duty," such as a "conscious disregard for one's responsibilities"[214] to an intent to act "with a purpose other than that of advancing the best interests of the [entity],"[215] to an "actual intent to do harm" to the partnership or its partners.[216] Another way of pleading bad faith matches the standard for a claim for waste, defined as a decision "so egregious or irrational that it could not have been based on a valid assessment of the [entity's] best interests."[217]

Bad faith is a state of mind. In an observation that remains as apt today as in the Victorian era, the nineteenth-century English judge Charles Bowen remarked, "The state of a man's mind is as much a fact as the state of his digestion."[218] Expressed less pithily, a mental state like bad faith is a question of fact. When making a factual finding about mental state, a fact finder only has access to observable indicia. "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications. Objective facts remain logically

---

[214] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 66 (Del. 2006).

[215] *Id.* at 67 (internal quotation marks omitted).

[216] *Id.* at 64.

[217] *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001).

[218] *Edgington v. Fitzmaurice* (1885) 29 Ch D 459 at 483 (Eng.). For Bluebook afficionados, the reporter during this period is cited without punctuation. *The Bluebook: A Uniform System of Citation* tbl. T2.46 (Columbia L. Rev. Ass'n et al. eds., 22d ed. 2025).

and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief."[219]

The trial judge's task is harder because humans rarely act for only one purpose. One of a trial court's hardest jobs is to assess the mental states of fiduciaries who act for multiple purposes. After scrutinizing the evidence, a trial judge may conclude that a fiduciary was sufficiently motivated by an inequitable purpose to warrant a finding of bad faith, or a court may reach the opposite conclusion. The answer depends on the facts and circumstances, credibility assessments, and how the fact finder weighs the evidence.

In this case, Kahlon acted with two subjective purposes. He sought selfishly to protect his own relationship with SpaceX and its leadership. He also sought to protect the Fund's ability to purchase SpaceX shares. The latter motivation was proper. The former was not, but here that motivation aligned with the proper motivation and led him to act in a way that served the best interests of the Fund. Kahlon therefore did not commit disloyal acts, even though he acted with mixed motives.

Under the circumstances, Kahlon's mixed motives do not provide grounds to rebut the business judgment rule on grounds of bad faith. But if I am wrong about that and, as a matter of law, the selfish component to Kahlon's subjective motivation

---

[219] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 2014 WL 2819005, at \*7 (Del. Ch. June 20, 2014) (citing *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 106 (Del. 2013)).

is sufficient alone to trigger entire fairness, then the Forced Redemption was fair to the Fund and its partners as a whole for the reasons discussed below.

### iii. Leo Group's Attempt To Prove Gross Negligence

Leo Group argues that both Kahlon and the General Partner breached their duty of care when engaging in the Forced Redemption. Unlike with the arguments based on disloyalty, including bad faith, Kahlon and the General Partner are not interchangeable for this purpose. Only the General Partner owed a duty of care.

To prove that the General Partner breached its duty of care, Leo Group must prove that the General Partner was grossly negligent. In civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'"[220] Under that framework, gross negligence "signifies more than

---

[220] *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)). This test "is the functional equivalent" of the test for "[c]riminal negligence." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987). By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

11 *Del. C.* § 231(a). The same statute provides that a person acts recklessly when "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct." *Id.* § 231(e). As with criminal negligence, the risk "must be of such a nature and degree that disregard thereof

54

ordinary inadvertence or inattention," but it is "nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm."[221] In Delaware entity law, by contrast, Delaware cases have held consistently that that gross negligence encompasses recklessness.[222]

Leo Group failed to prove that the General Partner acted recklessly when implementing the Forced Withdrawal. Though Kahlon resolved to remove Leo Group as a limited partner after a single, short call with Johnsen, the implication of that

---

constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*; *see id.* § 231(a).

[221] *Jardel*, 523 A.2d at 530.

[222] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008) ("[T]he definition [of gross negligence in corporate law] is so strict that it imports the concept of recklessness into the gross negligence standard . . . ."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (cleaned up)); *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." (internal quotation marks omitted)); *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (explaining that to be grossly negligent, a decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion" (citation and internal quotation marks omitted)); *see McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) ("[F]rom the sphere of actions that was once classified as grossly negligent conduct that gives rise to a violation of the duty of care, the Court has carved out one specific type of conduct—the intentional dereliction of duty or the conscious disregard for one's responsibilities—and redefined it as bad faith conduct, which results in a breach of the duty of loyalty. Therefore, Delaware's current understanding of gross negligence is conduct that constitutes reckless indifference or actions that are without the bounds of reason.").

call was clear: Kahlon had to remove Leo Group from the Fund or the Fund would not be able to purchase SpaceX shares.

Leo Group argues that Johnsen did not care about Leo Group's presence in the Fund because that involved the "relationship between [Kahlon] and his limited partners."[223] But that was not true for Leo Group after the publicity its investment received. Johnsen displayed his displeasure with Leo Group's presence in the Fund, referenced SpaceX's ability to exercise the ROFR to prevent the Fund's from purchasing the shares, and made clear that the Fund could not acquire SpaceX shares as long as Leo Group remained in the Fund. Johnsen wanted Leo Group out of the Fund. How Kahlon accomplished that was a matter for Kahlon to handle, because it turned on the Fund-level relationship between Kahlon and Leo Group.[224]

Leo Group argues that Kahlon had time to consider and weigh other options after the call. In fact, he didn't. SpaceX was already considering whether to exercise its ROFR, and there were only ten days until the date for the Fund to close on its purchase of the first tranche of shares. Kahlon also needed to act quickly and meaningfully to restore Johnsen's confidence. As Hussain noted, "Even [Johnsen] knows returning $50m check is big. . . . U doing it without question . . . is pretty impressive."[225]

---

[223] Johnsen Tr. 187–88.

[224] *Id.*; Kahlon Tr. 384–86.

[225] JX 531 at 77.

To be sure, by acting quickly, Kahlon foreclosed the possibility that he could convince Johnsen to allow the Fund's purchase to go forward with Leo Group as a limited partner. That, however, was unlikely. Kahlon believed—subjectively and reasonably—that Johnsen would not let the Fund acquire SpaceX shares if Leo Group remain involved. Johnsen was upset about the publicity that had already occurred, including the headline claiming that a Chinese company was backing SpaceX. That bell could not be unrung. The only answer for SpaceX was to prevent Leo Group from investing so that if a competitor tried to use the press coverage against SpaceX, the company could say that the stories were wrong and the transaction never happened.

Leo Group correctly points out that Kahlon was to blame for not going to Johnsen earlier. Leo Group also correctly points out that Kahlon hid his own responsibility by failing to mention the Side Letter and Exhibit A. But Leo Group did not make a convincing case that sharing that information would have changed Johnsen's mind. The press coverage about Leo Group's involvement would exist regardless. If Kahlon had come clean about his own involvement and his failure to bring Johnsen into the loop, it simply would have revealed that Kahlon had been part of the problem. For Kahlon to have revealed his own involvement could have further jeopardized his relationship with SpaceX and foreclosed the Fund's ability to participate in any transactions.

Leo Group also correctly points out that Kahlon could have explained to Johnsen that Leo Group's involvement did not raise any CFIUS concerns. Kahlon had obtained CFIUS advice years earlier, understood there was nothing barring indirect

Chinese investment through a Hong Kong entity, and had used that structure for such investors.[226] The lack of any formal regulatory problem, however, would not have assuaged Johnsen's concern that a SpaceX competitor could use the headlines about Leo Group's involvement in the Fund against SpaceX when competing for government contracts.

Leo Group's strongest argument for recklessness stresses Kahlon's failure to mention the Withdrawal Provision when engaging in the Forced Withdrawal. Kahlon stated in the letter agreement and the unilateral termination letter that Leo Group's participation in the Fund imposes "materially burdensome compliance obligations." [227] That language did not clearly track any provision of the LP Agreement. Only after MagStone sought clarification did Kahlon invoke the "adverse delay" language from the Withdrawal Provision. Regardless, Kahlon had the power as General Partner to remove Leo Group. Relatedly, Leo Group argues that Kahlon should have consulted counsel, but Kirkland drafted the termination letter, so Kirkland was involved. [228]

Kahlon's conduct was hardly commendable from a moral standpoint. He let Leo Group take the fall when they were blameless, and he did not reveal his own

---

[226] Kahlon Tr. 213 ("[P]rior to November 2021, did Tomales Bay have investors in its funds acquiring SpaceX shares that originated from China? A. Yes, we did."); *see also* Khalon Dep. 686; *see also* Kahlon Dep. 101, 467–68.

[227] JX 202 at 1; JX 218 at 2.

[228] JX 272.

involvement or take responsibility for the problem he created. It was not his finest hour.

Leo Group did not show that Kahlon acted recklessly. Leo Group proved that Kahlon acted callously towards one of his investors. Leo Group would be justified in never doing business with Kahlon again, and other investors might want to think twice. But Leo Group did not show that Kahlon breached his duty of care.

### c. The Business Judgment Rule And The Alternative Application Of Entire Fairness

Because Leo Group failed to rebut any of the presumptions of the business judgment rule, that standard of review protects Kahlon's decision to invoke the Withdrawal Provision as long as the decision was rational. The decision was plainly rational. It was perhaps the only choice available.

Even if Leo Group had proven a breach of duty and rebutted one of the presumptions of the business judgment rule, the burden of proof would shift to Kahlon to prove that his conduct was entirely fair.[229] The transaction must be

---

[229] *Disney II*, 906 A.2d 27, 52–53 (explaining that Delaware law "clearly permits a judicial assessment of director good faith" and that the business judgment rule can be rebutted by establishing "the directors breached their fiduciary duty of care or of loyalty or acted in bad faith" such that "[i]f that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders"); *accord Brehm*, 746 A.2d at 264 n.66; *Technicolor Plenary IV*, 663 A.2d at 1163; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363, 369 (Del. 1993); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010). Chief Justice Strine has argued that a breach of the duty of care should not rebut the business judgment rule and trigger entire fairness. He posited in an opinion written while serving as a Vice Chancellor that if a corporation has an exculpatory provision and if the plaintiff only seeks damages, then a breach of the

entirely fair to the entity and its undifferentiated equity. For purposes of the Forced Withdrawal, Leo Group was not a beneficiary of fiduciary duties; Leo Group was a contractual counterparty subject to the rights and duties in the LP Agreement.

The entire fairness standard has two dimensions: substantive fairness (fair price) and procedural fairness (fair dealing).[230] Though a court may analyze each aspect separately, they are not distinct elements of a two-part test. "All aspects of the issue must be examined as a whole since the question is one of entire fairness."[231]

The substantive dimension of the fairness inquiry examines the transactional result. The cases that developed the entire fairness test historically involved freeze-outs or squeeze-outs. The earliest freeze-outs involved corporations selling all of their assets for a package of consideration, typically cash, then dissolving and distributing the net cash to stockholders.[232] After mergers became the preferred transactional vehicle, the leading cases involved squeeze-outs in which the minority shares were

duty of care should not elevate the standard of review. *Goodwin v. Live Ent., Inc.*, 1999 WL 64265, at \*24 n.17 (Del. Ch. Jan. 25, 1999). He offered similar criticisms in a series of articles. *See Function over Form*, *supra* note 169, at 1301–05; *Realigning the Standard*, *supra* note 169, at 460–62; and Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 673–84 (2010). There is a fair argument for treating the duty of care differently, but this decision hews to the Delaware Supreme Court precedent.

[230] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[231] *Id.*

[232] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1033–34 (Del. Ch. 2020) (describing history of asset sales and mergers).

converted into the right to receive a specific amount of cash.[233] The substantive fairness of the transaction therefore largely turned on the price that the minority stockholders received, and "fair price" became the dominant nomenclature for the substantive dimension. In that setting, the fair price inquiry generally involved comparing what the stockholders received with their proportionate share of the corporation's value as a going concern. Thus, in the canonical framing, fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[234] But the substantive dimension of the entire fairness inquiry does not focus narrowly on evaluating a price. The true "test of fairness" is whether the minority stockholder receives at least "the substantial equivalent in value of what he had before."[235]

The procedural dimension of the entire fairness inquiry examines the process that generated the result to determine how closely it replicated arms' length

---

[233] *Id.*

[234] *Weinberger*, 457 A.2d at 711.

[235] *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952); *accord Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del. 1985) ("[T]he correct test of fairness is 'that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.'" (quoting *Sterling*, 93 A.2d at 114)); *see* Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 139 (2005) (arguing for a remedial standard that "provides the minority shareholders with the value of what was taken from them").

bargaining. Known as "fair dealing," it "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[236] In the canonical framing, it "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[237]

Economic fairness can be the predominant, even dispositive dimension of the fairness inquiry.[238] But the procedural dimension also matters because the substantive dimension is usually contestable. "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that

---

[236] *Kahn v. Tremont Corp.* (*Tremont II*), 694 A.2d 422, 430 (Del. 1997).

[237] *Weinberger*, 457 A.2d at 711.

[238] *In re Dole Food Co. S'holder Litig.*, 2015 WL 5052214, at *34 (Del. Ch. Aug. 27, 2015) ("Fair price can be the predominant consideration in the unitary entire fairness inquiry."); *accord In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 718 (Del. 2023) (citing *Dole Food*, 2015 WL 5052214, at *34); *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014) ("Following *Weinberger v. UOP, Inc.*, this Court has consistently held that, although entire fairness review comprises the dual components of fair dealing and fair price, in a non-fraudulent transaction 'price may be the preponderant consideration outweighing other features of the merger.'" (internal quotation marks omitted)); *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del. 2012) ("Evidence of fair dealing has significant probative value to demonstrate the fairness of the price obtained. The paramount consideration, however, is whether the price was a fair one."); *Weinberger*, 457 A.2d at 711 ("[W]e recognize that price may be the preponderant consideration outweighing other features of the merger."); *see In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 520 (Del. Ch. 2024) (citing *Dole Food*, 2015 WL 5052214, at *34) ; *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *27 (Del. Ch. July 21, 2017) (same).

will make determinations of fairness objective."[239] Consequently, the two aspects of the entire fairness standard interact.[240] "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."[241] If fiduciaries successfully replicate arm's length bargaining, then that evidence of procedural fairness can validate a debatable substantive outcome. But the opposite is also true: a dubious

---

[239] *Kahn v. Tremont Corp.* (*Tremont I*), 1996 WL 145452, at \*8 (Del. Ch. Mar. 21, 1996) (Allen, C.) ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept."), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[240] *Weinberger*, 457 A.2d at 711 ("[I]n a non-fraudulent transaction we recognize that price may be the preponderant consideration outweighing other features of the merger."); *Dole*, 2015 WL 5052214, at \*34 ("Fair price can be the predominant consideration in the unitary entire fairness inquiry."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 42 (Del. Ch. 2010) ("Price, however, is the paramount consideration because procedural aspects of the deal are circumstantial evidence of whether the price is fair."). Even a fiduciary that engaged in an unfair process an prove fairness at trial by establishing an indisputably fair price. *See Trados II*, 73 A.3d 17 (holding that fiduciaries did not breach their duties when they failed to follow a fair process yet nevertheless approved a transaction that yielded a fair price). Some Delaware decisions, however, have treated comparable scenarios as involving a breach of duty but no damages. *See, e.g.*, *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at \*52 (Del. Ch. Sept. 4, 2014) (finding breach of duty where transaction provided a fair price but process was not fair), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015); *Oliver v. Bos. Univ.*, 2006 WL 1064169, at \*25 (Del. Ch. Apr. 14, 2006) (finding a breach of the duty of loyalty based on a process failure but awarding only nominal damages because of a fair price). The distinction makes a difference. An adjudicated breach of duty can have significant knock-on effects for the availability of insurance and indemnification, as well as the fiduciary's status under various regulatory regimes.

[241] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 467 (Del. Ch. 2011) (collecting authorities).

process can call into question a low but nominally fair price.[242] "Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved."[243]

The entire fairness inquiry "is not itself a remedial calculation."[244] "For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness."[245] Once a court determines that a transaction is not entirely fair, then the court determines what remedy to award.

Here, Kahlon and General Partner proved that their actions were entirely fair to the Fund and its partners as a whole. By forcing Leo Group to withdraw from the Fund in return for its original $50 million capital contribution, Kahlon minimized the potential cost to the Fund and its partners. If Kahlon had sought to negotiate with

---

[242] *See Tremont II*, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *37 (Del. Ch. July 6, 2018) ("Just as a fair process can support the price, an unfair process can taint the price."), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1183 (Del. Ch. Nov. 4, 1999) ("[T]he unfairness of the process also infects the fairness of the price."), *aff'd*, 776 A.2d 437 (Del. 2000) (per curiam).

[243] *Sprint Corp.*, 2017 WL 3421142, at *19.

[244] *Reis*, 28 A.3d at 465.

[245] *Dole*, 2015 WL 5052214, at *33.

Leo Group, then Leo Group likely would have insisted on receiving something in return for leaving the Fund. And if Kahlon had not acted quickly and invoked the Withdrawal Provision, then the delay could have harmed the Fund by preventing it from ever having the opportunity to invest in SpaceX shares.

Under *Nemec*, the analysis does not consider the substantive fairness to Leo Group, and Leo Group was not forced to accept a financially unfair result by being required to accept the Forced Withdrawal on the terms contemplated by the Withdrawal Provision. Kahlon's actions were substantively fair from an economic perspective to the beneficiaries of his duties—the Fund and its partners as a whole.

The same is true for the procedural dimension of entire fairness. Kahlon acted in a fair manner towards the Fund and its partners as a whole by acting quickly to eliminate the problem that Leo Group posed. Under *Nemec*, the analysis does not consider the procedural fairness to Leo Group, and Leo Group was not forced to accept a procedurally unfair result by being required to withdraw in compliance with the Withdrawal Provision in the LP Agreement.

Kahlon's actions were therefore entirely fair to the beneficiaries of his duties—the Fund and its partners as a whole.

### d. Leo Group's Proven Claim For Breach Of The Duty Of Candor

In contrast to its earlier failures to prove a breach of duty, Leo Group proved that Kahlon breached his duty of candor. But Leo Group failed to prove its entitlement to any remedy other than nominal damages.

Absent contractual modification, a general partner owes fiduciary duties that include a duty of full disclosure.[246] That duty includes an obligation not to speak falsely, whether through affirmative falsehoods or material omissions.[247] "Partial disclosure, in which some material facts are not disclosed or are presented in an ambiguous, incomplete, or misleading manner, is not sufficient to meet a fiduciary's disclosure obligations."[248] The duty applies when one partner communications directly with another.[249]

For the duty of disclosure, there is no separate standard of review. A question of disclosure "is not a fact concerning the business of the Company," so "the independence (or good faith or due care) of [the fiduciary] is not directly relevant to a determination whether a disclosure obligation has been satisfied (disclosure not being a question of business judgment)."[250] The plaintiff must prove the elements of a claim

---

[246] *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008, 1023 (Del. Ch. 2010).

[247] *Id.*

[248] *Appel v. Berkman*, 180 A.3d 1055, 1064 (Del. 2018) (internal quotation marks omitted).

[249] *See Sussex Life Care Assocs. v. Strickler,* 1988 WL 156833, at *4 (Del. Ch. June 13, 1989) (noting that duty applied when buying partner communicated with selling partner).

[250] *In re Mobil Comm. Corp. Consol. Litig.*, 1989 WL 997182, at *1, *2 (Del. Ch. Apr. 3, 1989) (Allen, C.) (citation omitted); *accord In re Anderson, Clayton S'holders' Litig.*, 519 A.2d 669, 675 (1986) (Allen, C.); *In re Tri–Star Pictures, Inc. Litig.*, 1990 WL 82734, at *8–9 (Del. Ch. June 14, 1990) (same); *Lewis v. Leaseway Transp'n Corp.*, 1990 WL 67383, at *6 (Del. Ch. May 16, 1990) (same). Whether the disclosure was

made disloyally, in bad faith, or with insufficient care may be relevant for other purposes, such as exculpation.

A line of cases could be read to suggest that the business judgment rule protects a decision about what to disclose. In the *3Com* decision, when denying a motion seeking expedited discovery into disclosure claims, this court remarked that "[s]o long as the proxy statement, viewed in its entirety, sufficiently discloses and explains the matter to be voted on, the omission or inclusion of a particular fact is generally left to management's business judgment." *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *1 (Del. Ch. Dec. 18, 2009). For that proposition, the court cited *Kaplan v. Goldsamt*, 380 A.2d 556 (Del. Ch. 1977), a post-trial decision which said something similar. *Id.* at 565. The *Kaplan* decision in turn relied on *Schiff v. RKO Pictures Corp.*, 104 A.2d 267 (Del. Ch. 1954), which involved an application to enjoin an interested sale of assets to a dominant stockholder and was issued after an evidentiary hearing. One of the issues was whether the proxy statement should have provided values for a film library and a share of the profits from a movie called "The Robe." Chancellor Seitz viewed those assets as particularly difficult to value, noting that "much of the success of the movie industry is dependent upon the whims of a fickle public" and that managers in the movie business "often succeeded only by the application of unorthodox business methods." *Id.* at 276. In that context, he declined to find that the omissions of valuations for these assets constituted disclosure violations, observing that the omission or inclusion of that type of valuation was "within an area of management judgment." *Id.* at 280. Chancellor Seitz's observation was thus far more limited than how *3Com* and *Kaplan* portrayed it.

A decade ago, only two decisions referenced the *3Com* formulation. *See Ehlen v. Conceptus, Inc.*, 2013 WL 2285577, at *2 (Del. Ch. May 24, 2013) (citing *3Com*, 2009 WL 5173804, at *1); *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *10 (Del. Ch. Feb. 29, 2012) (same). Recently, the phrase experienced a renaissance, and it has appeared in five decisions in the last four years. *See In re Anaplan, Inc. S'holders Litig.*, 2024 WL 3086013, *7 (Del. Ch. June 21, 2024); *Teamsters Loc. 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at *10 (Del. Ch. Jan. 31, 2023); *In re Match Gp., Inc. Deriv. Litig.*, 2022 WL 3970159, at *27 (Del. Ch. Sept. 1, 2022); *City Pension Fund for Firefighters & Police Officers in City of Mia. v. Trade Desk, Inc.*, 2022 WL 3009959, at *16 (Del. Ch. July 29, 2022); *Teamsters Loc. 237 Additional Sec. Benefit Fund v. Caruso*, 2021 WL 3883932, at *29 (Del. Ch. Aug. 31, 2021).

None of the cases actually apply the business judgment rule to a disclosure issue. If *3Com* simply means that a disclosure should be read as a whole, then the ruling makes sense. *See In re GGP, Inc. S'holder Litig.*, 282 A.3d 37, 73 (Del. 2022)

that is tied to the standard of conduct itself. When a beneficiary who communicated directly with the fiduciary seeks to recover damages, the beneficiary must prove (1) a material misrepresentation or omission, (2) reliance, and (3) causally related damages.[251]

To begin, Leo Group argues that Kahlon misled them by failing to disclose SpaceX's preferences regarding investors from China and public disclosures. That claim fails. The time when Kahlon would have disclosed that information was when Leo Group and Kahlon were negotiating Leo Group's investment in the Fund. At that point, Leo Group was not yet a limited partner and so not yet a beneficiary of Kahlon's fiduciary duties.

Next, Leo Group argues that Kahlon lied when failing to mention the Side Letter or its Exhibit A to SpaceX. Kahlon did not owe a duty of candor to SpaceX, and his failure to disclose that information to SpaceX did not harm the Fund nor its

---

(Traynor, J., concurring in part) ("When determining whether there has been a disclosure violation, a proxy statement should be read as a whole." (quoting *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at \*18 (Del. Ch. Dec. 11, 2017), and two other decisions, including *3Com* and its reference to "management's business judgment.")). Fiduciaries should get the benefit of the doubt on hard disclosure calls made under factually ambiguous circumstances. But *3Com* should not be read to suggest that the business judgment rule protects any rational decision that a fiduciary makes about what to disclose. That interpretation would replace the duty to disclose material information with a duty to disclose only what the fiduciary rationally believes constitutes sufficient material information.

[251] *See Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 315 (Del. Ch. 2013).

relationship with SpaceX. Kahlon had a duty to act in the best interests of the Fund, and maintaining his relationship with SpaceX served the best interests of the Fund.

Leo Group does better when arguing that Kahlon formulated what he described as a "bullshit" communication plan to convince Leo Group to withdraw from the Fund consensually.[252] Relatedly, Kahlon sent letters to Leo Group and SpaceX that contained conflicting accounts, neither of which was accurate. And in their discussions with Leo Group, Kahlon and Gulf Asia depicted Johnsen's reaction as capricious and concealed that he was both uninformed and misinformed.

When Kahlon chose to speak to Leo Group in these settings, he took on a duty to speak honestly and completely. He could not engage in partial or misleading disclosures. By speaking falsely and partially, Kahlon failed to comply with his duty of candor.

Leo Group failed, however, to prove reliance or any causally related harm. Leo Group did not act to its detriment in reliance on Kahlon's misstatements. Leo Group did not agree to a consensual withdrawal, could not avoid the Forced Withdrawal, and did not suffer any other harm. Kahlon did not gain any benefit other than through the exercise of the Withdrawal Provision, and the Fund was already entitled to that contractual benefit through the provision's valid exercise. As discussed below, he exercised the Withdrawal Provision in compliance with its terms. As discussed above, he did so in a manner that was entirely fair to Leo Group.

---

[252] *See* Kahlon Tr. 395.

Still, Leo Group proved a breach of duty, and that breach warrants an award of nominal damages. The General Partner and Kahlon are liable to Leo Group in the amount of $1 for breaching their duty of candor.

### 3.      Conclusion Regarding The Breach Of Duty Claim

Except for the breach of the duty of candor, Leo Group failed to prove a fiduciary breach. Assuming Leo Group did rebut one of the elements of the business judgment rule, Kahlon and the General Partner proved that their actions were entirely fair to the Fund and its partners as a whole. On that basis, judgment on the breach of fiduciary duty claim will be entered in their favor on those claims. Kahlon and the General Partner are, however, liable for breaching he duty of candor. Leo Group is only entitled to nominal damages on that claim.

### B.      Breach of the LP Agreement

Leo Group sought to prove that Kahlon breached the LP Agreement in several ways: first, by engaging in the Forced Withdrawal; second, by failing to use reasonable efforts to avoid any need to engage in the Forced Withdrawal, and third by acting too quickly when engaging in the Forced Withdrawal.

The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that

warrants a remedy, such as damages or in an appropriate case, specific performance.[253]

1.    **Principles of Contract Interpretation**

The LP Agreements a contract governed by Delaware law.[254] When interpreting a contract, Delaware courts "give words their plain meaning unless it appears that the parties intended a special meaning."[255] "If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[256] "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."[257] "And, in the case of an undefined term, the interpreting court may consult the dictionary, if that is deemed useful, when determining the term's plain meaning."[258]

---

[253] *Trifecta Multimedia Hldgs. Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 470 (Del. Ch. 2024).

[254] *See* 6 *Del. C.* § 17-1101(b).

[255] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

[256] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[257] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins.*, 616 A.2d 1192, 1196 (Del. 1992).

[258] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *10 (Del. Ch. July 6, 2018).

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[259] "Even if the Court determines that one party's reading of the contract is more reasonable or natural, that does not preclude a finding of ambiguity."[260] If parties have engaged in "bilateral negotiations," and the contract that resulted from those negotiations contains an ambiguous term, then courts may look to extrinsic evidence to resolve the ambiguity.[261]

In other circumstances, however, extrinsic evidence is unhelpful. "If the contractual language at issue is ambiguous and if [one party] did not negotiate for the agreement's terms, [Delaware courts] apply the contra proferentem principle and construe the ambiguous terms against the drafter."[262] If "the articulation of contract terms . . . appears to have been entirely within the control of one party . . . that party bears full responsibility for the effect of those terms."[263] This is because "[a]s the

---

[259] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (footnote omitted).

[260] *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2017 WL 2167193, at *2 n.8 (Del. Ch. May 17, 2017) (cleaned up).

[261] *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998).

[262] *Norton*, 67 A.3d at 360.

[263] *SI Mgmt.*, 707 A.2d at 44.

entity in control of the process of articulating the terms of the [agreements], it [is] incumbent on the [drafter] to make their terms clear."[264]

### 2. The Possible Defendants

A breach of contract claim can be asserted only against parties to the contract.[265] The Fund and the General Partner are parties to the LP Agreement. Kahlon is not. On that basis, judgment on the breach of contract claim will be entered as to Kahlon. For simplicity, however, this decision will continue to refer to Kahlon as the principal actor.

### 3. Breach of the Withdrawal Prohibition

Section 7.4 of the LP Agreement addresses when a limited partner can be forced to withdraw from the Fund. Subject to specified exceptions, the provision states that "no Limited Partner may withdraw as a Partner of the Partnership, nor shall any Limited Partner be required to withdraw from the Partnership . . . ." (the "Withdrawal Prohibition"). Unless an exception applies, Kahlon breaches the Withdrawal Prohibition by forcing an investor to withdraw.

The Withdrawal Provision authorizes the General Partner to force a limited partner to withdraw from the Fund "in the reasonable judgment of the General Partner, a Limited Partner's status as a Partner would be reasonably likely to result

---

[264] *Juul Labs, Inc. v. Grove*, 238 A.3d 904, 911 (Del. Ch. 2020) (cleaned up).

[265] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.* (*Gotham III*), 817 A.2d 160, 172 (Del. 2002) ("[O]nly a party to a contract may be sued for breach of that contract.").

73

in a significant and adverse delay with respect to the activities of, or an extraordinary expense of, or a material adverse effect on, the Partnership, any of its Portfolio Companies or any of their respective Affiliates.[266] Because the Withdrawal Provision operates as an exception to the Withdrawal Prohibition, Kahlon bore the burden of proving that it came within its terms.[267]

In this litigation, Kahlon relied on having a "reasonable judgment" that Leo Group's participation was "reasonably likely" to result in (i) a "significant and adverse delay" and (ii) a "material adverse effect on the [Fund]." Kahlon proved with clear and convincing evidence that both exceptions were satisfied. Assuming the contrary, Leo Group failed to prove causally related harm.

---

[266] LP Agreement § 7.7(b)(ii).

[267] *Texas Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 565 (Del. Ch. 2023) ("Because the Investor Group seeks to establish an exception to the Voting Commitment, the Investor Group has the burden of proving that the extrinsic evidence supports the existence of an exception."), *aff'd*, 314 A.3d 685 (Del. 2024); *Menn v. ConMed Corp.*, 2022 WL 2387802, at *25 (Del. Ch. June 30, 2022) (holding that where the plaintiff proved that the defendants breached their obligation under a stock purchase agreement, the defendants bore "the burden of proving the existence of [an] exception"); *Snow Phipps Gp., LLC v. Kcake Acq., Inc.*, 2021 WL 1714202, at *29 (Del. Ch. Apr. 30, 2021) ("Kohlberg bore the initial, heavy burden of proving that an event had occurred that had or would reasonably be expected to have a material adverse effect on DecoPac. If Kohlberg met that burden, then Plaintiffs bear the burden of proving that the relevant event fell within the exception . . . ." (footnote omitted)); *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *51 (Del. Ch. Nov. 30, 2020) ("Buyer had the burden to prove that Seller suffered an effect that was material and adverse. After that, Seller had the burden to prove that the source of the effect fell within an exception.").

### a.    A Reasonable Judgment

The Withdrawal Provision requires a reasonable judgment. Kahlon proved that he made a reasonable judgment before engaging in the Forced Withdrawal.

When a contract uses a term like "reasonable" and "reasonably," the provision incorporates both a subjective and objective component. Subjectively, the party making the decision must have actually believed the justification proffered. Furthermore, the court must agree that an objective, reasonable person would view the justification as sufficient. [268] Applied to this case, Kahlon had to believe subjectively that Leo Group's continued status as a limited partner would be reasonably likely to result in a significant and adverse delay or cause a material adverse effect on the Fund, and that belief had to be objectively reasonable.

Leo Group argues that making a reasonable judgment means acting reasonably when making the judgment, effectively introducing a duty to use reasonable care. Kahlon proved that he acted reasonably.

First, Johnsen made clear during their call that he would not let the Fund buy SpaceX shares as long as the Fund remained a limited partner. Kahlon believed—reasonably and in good faith—that he would not be able to change Johnsen's mind. Johnsen objected to press coverage that could not be unrung, including a news story

---

[268] *E.g.*, *Allen v. Encore Energy P'rs L.P.*, 72 A.3d 93, 104, 107 (Del. 2013); *In re Riviera Res., Inc.*, 291 A.3d 1091, 1099, 1100 (Del. Ch. 2023).

claiming that SpaceX was being backed by Leo Group. SpaceX needed to say that the headline was not true, which meant Leo Group could not be allowed to invest.

Given that the publicity was the problem, Kahlon had no alterative other than to remove Leo Group from the Fund. Explaining that Leo Group was not to blame for the publicity would not change the reality of the situation. Kahlon had to move quickly because SpaceX was considering whether to exercise its ROFR and the planned closing for the Fund to buy the first tranche of shares was only days away. Kahlon also had to move quickly because showing contrition and loyalty was necessary for him to not become "*persona non grata*" in SpaceX's small circle of trusted intermediaries.[269]

Albeit insincerely, Kahlon initially attempted to negotiate a consensual withdrawal. When Leo Group refused, Kahlon worked with Kirkland to prepare a letter effectuating a Forced Withdrawal.

A reasonable process need not be optimal. It need not even be pretty. Under the circumstances, Kahlon followed a reasonable process.

### b.  Significant and Adverse Delay

The Withdrawal Provision allows a forced withdrawal if "in the reasonable judgment of the General Partner, a Limited Partner's status as a Partner would be reasonably likely to result in significant and adverse delay with respect to the activities of [the Fund]." Kahlon proved that was the case here.

---

[269] *See* Kahlon Tr. 220.

The trial record established that Johnsen would not let the Fund acquire SpaceX shares as long as Leo Group remained a limited partner. The longer Leo Group remained in the Fund, the longer it would be until SpaceX permitted the Fund to buy SpaceX shares. That reality gave Kahlon an objectively reasonable basis to force Leo Group to withdraw from the Fund.

Kahlon subjectively held that belief. Admittedly there is no evidence that Kahlon contemporaneously considered the delay-oriented language in the Withdrawal Provision, he clearly had in mind the reality that Johnsen would not let the Fund acquire SpaceX shares as long as Leo Group remained in the Fund. Kahlon therefore met both the subjective and objective requirements of the Withdrawal Provision.

### c.   Material Adverse Effect

The Withdrawal Provision also allows a forced withdrawal if "in the reasonable judgment of the General Partner, a Limited Partner's status as a Partner would be reasonably likely to result in . . . a material adverse effect on, the [the Fund]." Through the General Partner, Kahlon satisfied that requirement.

Leo Group contends that "material adverse effect" is a term of art that means the same thing it does in Delaware M&A jurisprudence.[270] Accepting that framework

---

[270] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008).

for purposes of analysis, Johnsen's reaction to Leo Group's involvement in the Fund caused a material adverse effect.

The Fund's reason for existence was to acquire SpaceX shares. Leo Group bargained in the Side Letter for confirmation that its capital contribution could be used only to acquire SpaceX shares.[271] If the Fund could not acquire SpaceX shares with Leo Group in the Fund, then the Fund could not fulfill its purpose. The Fund's investors—including Leo Group—would have would own a vehicle that could not buy SpaceX shares despite having contributed their capital for that purpose. When an entity cannot achieve the purpose for which it was created, the entity has suffered a material adverse effect. That reality gave Kahlon had an objectively reasonable basis to force Leo Group to withdraw from the Fund.

Here again, there is no evidence that Kahlon contemporaneously considered the material-adverse-effect language of the Withdrawal Provision when engaging in the Forced Withdrawal. Nevertheless, after speaking with Johnsen, he clearly had in mind that Johnsen would not let the Fund acquire SpaceX shares as long as Leo Group remained in the Fund, as well as the disastrous consequences that would have for himself and the Fund. Kahlon again met both the subjective and objective requirements of the Withdrawal Provision.

---

[271] JX 76 at 1; JX 100.

### d. A Contractually Anticipated Reason

Leo Group argues that Kahlon could not rely on the consequences of its public announcement to justify the Forced Withdrawal because the Side Letter specifically authorized Leo Group to act as it did. If Kahlon argued that the announcement standing alone warranted invoking the Withdrawal Provision, then Leo Group could be correct. But what justified the Forced Withdrawal was Johnsen's reaction to Leo Group's announcement and the attendant publicity, not the announcement itself. Kahlon had not bargained away the General Partner's ability to respond to how SpaceX viewed the announcement and accompanying publicity. The existence of the Side Letter authorizing Leo Group's announcement therefore does not prevent Kahlon from relying on the Withdrawal Provision.

### e. No Causally Related Harm Warranting A Remedy

Assuming for purposes of analysis that Kahlon in fact breached the Withdrawal Provision, Leo Group failed to prove that the breach resulted in causally related harm warranting a remedy. Because of the Forced Withdrawal, Leo Group lost the opportunity to invest in SpaceX shares. If Leo Group had remained in the Fund, the Fund would have lost the opportunity to invest in SpaceX shares. Leo Group would be in the same position regardless. What caused harm to Leo Group was (i) Johnsen's assessment of the risk to SpaceX resulting from the publicity surrounding Leo Group's announcement of its investment and (ii) Johnsen's determination not to allow the Fund to invest as long as Leo Group remained involved because of the risk that SpaceX's competitors would use Leo Group's involvement as

79

a weapon against SpaceX in Washington, D.C.[272] Johnsen's decisions meant that Leo Group could not achieve an investment in SpaceX through the Fund, meaning that Leo Group was not harmed by the Forced Withdrawal.

### f. No Breach Of The Withdrawal Prohibition

The General Partner did not commit an actionable breach of the Withdrawal Prohibition by engaging in the Forced Withdrawal. Judgment will be entered in favor of the General Partner on this issue.

### 4. No Breach of the Efforts Prohibition

The Withdrawal Provision contains other exceptions to the Withdrawal Prohibition. Many envision regulatory issues that would prevent a limited partner from continuing as an investor in the Fund. Some contemplate the limited partner raising the issue; others envision the General Partner raising the issue. Except for the type of withdrawal at issue here, the exceptions contemplate the party raising the issue obtaining an opinion of counsel supporting the regulatory problem. Section 7.7(c) then contemplates that the General Partner will have a period of 180 days (or as short as 90 days if the opinion of counsel reasonably recommends a briefer period) to cure the regulatory problem. During that period, the General Partner must use reasonable efforts to correct the regulatory issue or otherwise find a solution (the "Efforts Provision"). Leo Group claims the General Partner breached Efforts Provision by not trying to cure the basis for the Forced Withdrawal.

---

[272] Johnsen Tr. 199.

Leo Group's claim of breach fails in the first instance because the Efforts

Provision only applies to a regulatory issue identified through an opinion of counsel.

The Efforts Provision states that if a basis for a forced withdrawal exists, then:

> The General Partner shall have a period of 180 days (or such lesser period reasonably recommended in the counsel's opinion delivered pursuant to Section 7.7(b), but in no event less than 90 days, except where a period of less than 90 days is explicitly required under relevant law) following receipt of such counsel's opinion (the 'Remedy Period') to use its reasonable efforts to eliminate the necessity for such withdrawal whether by correction of the condition giving rise to the necessity of the Regulated Partner's withdrawal . . . .[273]

By its terms, the Efforts Provision applies only when the General Partner has

received and acts based on a regulatory issue identified in an opinion of counsel.

The Efforts Provision does not apply in this case because the General Partner

did not invoke the Withdrawal Provision based on a regulatory issue identified in an

opinion of counsel. Kahlon acted in response to Johnsen's clear message that he would

not allow the Fund to purchase SpaceX shares as long as Leo Group was a limited

partner.

Assuming the Efforts Provision did apply, then the General Partner did not

breach it. Under the Efforts Provision, the General Partner must "use its reasonable

efforts to eliminate the necessity of such withdrawal . . . provided that the General

Partner shall not be required to forgo any investment opportunity on behalf of the

---

[273] LP Agreement § 7.7(c).

Partnership or the Parallel Fund to solve a Limited Partner Regulatory Problem."[274] Kahlon proved that there were no reasonable steps for him to take and that delay would have cost the Fund its ability to buy SpaceX shares.

During their call, Johnsen made clear to Kahlon that the Fund could not buy shares if Leo Group remained a limited partner. Kahlon concluded—reasonably— that he could do nothing to change Johnsen's mind. Even if he or Leo Group explained the existence of the Side Letter and Exhibit A, it would not change the press coverage or the headline claiming that a Chinese company was backing SpaceX. To avoid a threat that a competitor could use that headline against SpaceX, Johnsen could not let the Fund invest if Leo Group remained involved. If Kahlon had waited until the end of the cure period, the Fund would have lost its ability to acquire SpaceX shares. Kahlon properly acted to avoid foregoing an investment opportunity.

But even if the General Partner breached the Efforts Provision, Leo Group failed to prove that the breach resulted in causally related harm warranting a remedy. Here again, Johnsen's testimony established that SpaceX would not let the Fund acquire shares while Leo Group remained an investor. After the efforts period expired, the Fund still would not have been able to invest in SpaceX shares. Leo Group would be in the same position it is in now. The only difference would be that the Fund would suffer in addition to Leo Group.

---

[274] *Id.* (emphasis in original)

Judgment will be entered in favor of the General Partner on the claim for breach of the Efforts Provision.

**5.      Breach of the Timing Requirement**

Section 7.7(f) of the LP Agreement states that the General Partner can only effect a forced withdrawal on "the last day of the calendar quarter during which the election or demand for withdrawal is made" (the "Timing Requirement"). Leo Group claims that Kahlon caused the General Partner to breach the Timing Requirement, but that claim fails as well.

The timing requirement states:

> If the General Partner does not sell the Regulated Partner's interest pursuant to a Regulatory Sale or provide for a Regulatory Solution or otherwise correct the condition giving rise to the necessity of the Regulated Partner's withdrawal within the Remedy Period, then such Regulated Partner may withdraw or be required to withdraw in whose or in part from the Partnership following the expiration of the Remedy Period as of the date that is the earlier to occur of (i) the last day of the calendar quarter during which the election or demand for withdrawal is made and (ii) such date for withdrawal as may be recommended in the Opinion of the Partnership's Counsel or the Opinion of Limited Partner's Counsel, as appropriate.

It thus applies to a withdrawal triggered by a regulatory problem supported by an opinion of counsel. It does not apply to the Forced Withdrawal at issue.

Even if the Timing Requirement applied, Kahlon still did not breach it. The Timing Requirement turns on the "Remedy Period," defined in the Efforts Provision. The Timing Requirement also acknowledges that "the General Partner shall not be

83

required to forgo any investment opportunity on behalf of the Partnership."[275] Kahlon could not wait. The Fund needed to invest in SpaceX shares. If Kahlon had waited any longer, the Fund would have lost any chance at buying shares.

Even assuming breach, Leo Group would not be entitled to a meaningful remedy. Leo Group does not point to any economic harm from the breach of the Timing Requirement, such as a loss of a distribution. Leo Group asserts instead that the breach deprived Leo Group of its information rights, with Leo Group sought to invoke on December 17, 2021,[276] but the General Partner ignored.

Leo Group has not proven breach, so judgment will be entered in favor of the General Partner on this claim. Assuming a breach existed, the court only would award nominal damages.

### 6. Breach of the Forum Selection Provision

In its final contract claim, Leo Group asserts that the defendants breached a forum selection provision by filing the California Action and the Delaware Superior Court Action. That claim fails.

A party can recover damages for breach of a forum selection provision measured by the expenses (including attorneys' fees) incurred litigating in the foreclosed forum.[277] Here, there was no breach.

---

[275] LP Agreement § 7.7(c).

[276] JX 1004; *see also* LP Agreement § 11.1.

[277] *See Namdar v. Fried*, 2025 WL 1604402, at *3 (Del. Ch. June 6, 2025).

Neither the LP Agreement nor the Side Letter contains a forum selection provision. The subscription agreement contains a one-way forum selection provision. It requires that a limited partner like Leo Group sue in Delaware, but does not bind the Fund, the General Partner, or their affiliates. [278]

That leaves only the Confidentiality Stipulation. That stipulation at least contains a forum selection clause that selections the Delaware courts. It states that each party "agrees that all claims in respect of [any suit, action, or proceeding arising out of or relating to this Stipulation] shall be brought, heard, and determined exclusively in the Delaware Court of Chancery (provided that, in the event that subject matter jurisdiction is unavailable in that court, then all such claims shall be brought, heard, and determined exclusively in any other state or federal court sitting in the State of Delaware.[279] None of the defendants breached that provision.

After Leo Group filed suit, the General Partner and the Fund filed the California Action. They asserted that Leo Group fraudulently promised to abide by the LP Agreement to become a limited partner and announce the investment.

The General Partner and the Fund also filed the Superior Court Action. They asserted the same fraud claim as in the California Action, and they also asserted that Leo Group tortiously caused the Investment Vehicle to breach the LP Agreement by announcing the investment.

---

[278] *See* JX 102 § 5(i).

[279] Dkt. 41 ¶ 30.

85

The filing of the California Action did not breach the forum selection provision because the asserted claim related to the underlying events, not the Confidentiality Stipulation. The filing of the Superior Court Action did not breach the forum selection provision for the same reason.

The forum selection clause in the Confidentiality Stipulation encompasses disputes over the Confidentiality Stipulation. It does not operate as an umbrella forum selection clause concentrating all litigation relating to the underlying events in this court. Leo Group failed to prove breach.

## III.   CONCLUSION

Judgment will be entered in favor of Leo Group in the amount of $1, reflecting an award of nominal damages against Kahlon and the General Partner for breach of the duty of candor. Otherwise, judgment will be entered in favor of the defendants and against Leo Group. Within thirty days, the parties must submit a proposed final order, agreed as to form. If there are issues to address before a final order can be entered, then the parties must submit a joint letter identifying those issues and proposing a path forward. Any remaining items must be existing issues that need to be addressed to end this proceeding. This instruction is not an invitation for the parties to raise new issues or seek a do-over.